Robson BONNICHSEN, C. Loring Brace, George W. Gill, C. Vance Haynes, Richard L. Jantz, Douglas W. Owsley, Dennis J. Stanford, and D. Gentry Steele, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT OF THE ARMY, U.S. Army Corps of Engineers, Bartholomew B. Bohn II, Donald R. Curtis, and Lee Turner, Defendants.

ASATRU FOLK ASSEMBLY, Stephen A. McNallen, William Fox, Plaintiffs,

v.

UNITED STATES of America, DEPARTMENT OF THE ARMY, U.S. Army Corps of Engineers, Ernest J. Harrell, Donald R. Curtis, and Lee Turner, Defendants.

Nos. 96–1481–JE, 96–1516–JE.

United States District Court,
D. Oregon.

Feb. 19, 1997.

Alan L. Schneider, Portland, OR, George L. Kirklin, Paula A. Barran, Lane Powell Spears Lubersky, Portland, OR, for Plaintiffs.

Daria J. Zane, U.S. Department of Justice, Environment & Natural Resources Division, General Litigation Section, Washington, DC, Kristine Olson, U.S. Attorney, Dist. of Oregon, Tim Simmons, Assistant U.S. Attorney, Portland, OR, for Defendants.

## OPINION

JELDERKS, United States Magistrate Judge.

In July 1996, a skeleton was found along the Columbia River in Benton County, Washington. The coroner and local police were notified, and the skeleton removed. Several forensic anthropologists briefly examined the remains. Their preliminary examinations raised more questions than they answered about the ethnic background of that individual.[1] Radiocarbon testing was then performed. The results indicated that the skeleton is of a man who walked the earth more than 9000 years ago.

The discovery attracted considerable attention from the media, which called the skeleton "Richland Man" or "Kennewick Man" (both terms referring to cities in the area near where the remains were found).

Soon afterwards, the Army Corps of Engineers (the "Corps") took custody of the remains.[2] On or about September 17, 1996, the

---

**1.** Although the parties have tendered copies of those reports, the specific findings are not detailed in the complaint. Consequently, those findings will not be considered by the court in deciding the instant motions to dismiss except to the extent, if any, that they may pertain to jurisdictional issues.

**2.** The discovery was made on federal land within the Corps' management authority.

Corps published in a local newspaper a "Notice of Intent to Repatriate Human Remains." The Notice stated, in relevant part, that (1) the notice of repatriation was being issued pursuant to the Native American Graves Protection and Repatriation Act, 25 U.S.C. § 3005(a) ("NAGPRA"), (2) the Corps had determined that the remains were of Native American ancestry, (3) the Corps had determined that the remains had been inadvertently discovered on federal land recognized as the aboriginal land of an Indian tribe, (4) the Corps had determined that there is a relationship of shared group identity which can be reasonably traced between the human remains and five Columbia River basin tribes and bands, (5) that the Corps intended to repatriate [3] the remains to those tribes, (6) that notice had been given to certain Indian tribes, (7) that "[r]epresentatives of any other Native American Tribe which believes itself to be culturally affiliated with these human remains should contact the Corps of Engineers prior to October 23, 1996," and (8) that repatriation may begin after this date if no additional claimants come forward.

In the days following publication of the Notice of Intent, several scientists wrote the Army Corps of Engineers to protest the decision to repatriate the remains. These scientists argued that the discovery of a well-preserved skeleton of this antiquity in North America represented a "rare discovery of national and international significance" that could shed considerable light on the origins of humanity in the Americas. The scientists believed—and defendants have not disputed—that following repatriation the remains would be buried in an undisclosed location and no further examination or study of the remains would be possible. The scientists also questioned whether, in light of the estimated age of the remains and the preliminary reports from the forensic anthropologists, the remains were those of a Native American, or could be linked to any modern Native American peoples.[4]

The scientists asked the Corps of Engineers to reconsider its decision to repatriate the remains. The Corps did not respond to these letters.[5] With the deadline for repatriation imminent, a group of scientists (the *Bonnichsen* plaintiffs) filed suit seeking a temporary restraining order to halt the repatriation. The *Bonnichsen* plaintiffs demanded a detailed scientific study to determine the origins of the man before the Corps decided whether to repatriate the remains. The *Bonnichsen* plaintiffs also sought to enjoin alleged violations of NAGPRA, to declare the agency actions at issue null and void, and for an injunction to prevent defendants from "depriving plaintiffs from access to Richland Man."

A second action was filed by members of the Asatru Folk Assembly (the *Asatru* plaintiffs), which is described in the complaint as a legally-recognized church "that represents Asatru, one of the major indigenous, pre-Christian, European religions." The *Asatru* plaintiffs contend that the man is actually one of their ancestors, and is not related to present-day Native Americans at all but rather to Europeans. The *Asatru* plaintiffs want this court to set aside the decision of the Corps to repatriate the remains, and to compel the Corps to allow scientific testing of

---

3. It has been suggested that the term "repatriate" should be used only when referring to items that were in the possession or control of a federal agency or a museum prior to November 16, 1990. *But cf. Pueblo of San Ildefonso v. Ridlon,* 103 F.3d 936 (10th Cir.1996) (NAGPRA's repatriation provisions do not depend upon when or where the object subject to repatriation was found, but whether the item is presently in the possession or control of federal agencies or federally-funded museums; and also noting a distinction between "ownership" and "repatriation"). I do not decide that question since it is not presently before me. I have used the term "repatriate" in this opinion since it is the term used in the Notice of Intent.

4. Since this is a motion to dismiss, the court is primarily concerned with the legal sufficiency of the allegations made by the plaintiffs. For purposes of this motion, the factual allegations in the complaint are presumed to be true (with the exception of certain jurisdictional matters). That does not mean the court either agrees or disagrees with those allegations, or that the court is unaware that there may be other views and concerns such as those that are reflected in NAGPRA.

5. Several months *after* this lawsuit was filed, the Corps responded to these and other letters.

the remains to determine his origins and which contemporary populations he is most closely associated with. If the remains prove to be of European origin, the *Asatru* plaintiffs want custody of the remains for study and "for eventual reinterment in accordance with native European belief." Both sets of plaintiffs also assert challenges to the constitutionality of NAGPRA and to the legality of various actions taken by the Corps.

On October 23, 1996, this court held a hearing on the request for a temporary restraining order. Defendants agreed to give plaintiffs at least 14 days notice prior to repatriation so plaintiffs could seek relief from this court. The court issued an order consistent with that agreement.

Defendants now move to dismiss both actions, asserting that the claims are not ripe, plaintiffs have failed to exhaust their remedies, plaintiffs have failed to state a claim, and that the claims are barred by sovereign immunity. Since the complaints, motions, and briefs in each case are very similar, I will treat them as one motion for purposes of this opinion except where there is a need to distinguish between the two complaints.

### STANDARDS

■ Two different standards govern the motions to dismiss in this case. Defendants' motion to dismiss for failure to state a claim challenges the legal sufficiency of the complaint. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Because the court rules before it receives any evidence, such motions are disfavored. 5A C. Wright & A. Miller, *Federal Practice and Procedure* § 1357 (1984). For purposes of the motion, the factual allegations in the complaint are presumed to be true, and are viewed in the light most favorable to the non-moving party. *Cassettari v. County of Nevada*, 824 F.2d 735, 737 (9th Cir.1987). A motion to dismiss under Rule 12(b)(6) will be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Gibson v. United States*, 781 F.2d 1334, 1337 (9th Cir.1986), *cert. den.*, 479 U.S. 1054, 107 S.Ct. 928, 93 L.Ed.2d 979 (1987). The question is not whether the plaintiff

ultimately will prevail, but whether he cannot possibly prevail even if the allegations in the complaint are assumed to be true. The court may not dismiss a claim merely because the pleadings indicate that the likelihood of prevailing is remote. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Nor, at this stage of the proceedings, does the court consider whether there is any evidence to support the allegations that have been made in the complaint.

■ A different standard of review applies to defendants' motion to dismiss on grounds of ripeness or failure to exhaust administrative remedies. Since the motion is not directed at the merits of the controversy but to the court's jurisdiction to hear the controversy, the district court may hear evidence on the jurisdictional question and resolve any factual disputes regarding that jurisdictional issue to the extent such disputes are separable from the merits of the case itself. *Winter v. Calif. Medical Review, Inc.*, 900 F.2d 1322, 1324 (9th Cir.1990); *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Unlike a motion to dismiss for failure to state a claim, the court is not required to assume the truth of the jurisdictional allegations proffered by the plaintiffs. However, the court's ruling is limited to the question of whether it has jurisdiction over the controversy. A determination that the court has (or does not have) jurisdiction over the case is not an opinion on the merits of the claims asserted in that case.

### DISCUSSION

#### 1. Ripeness and exhaustion:

Defendants contend the issues are not ripe for judicial review because they did not make any final decision, and because plaintiffs have not exhausted their administrative remedies. I disagree.

■ Ripeness is "a question of timing." *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 140, 95 S.Ct. 335, 357, 42 L.Ed.2d 320 (1974). There are several principles that shape the doctrines of ripeness and exhaustion. First, the courts ordinarily will review only a final agency action so as not to interfere with the agency's decision-making pro-

cess. *Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 562 (9th Cir.1992). However, this finality element must be interpreted in a "pragmatic" and "flexible" manner. *Id.* *Cf. Seattle Audubon Society v. Espy,* 998 F.2d 699, 703 (9th Cir.1993) (challenge to spotted owl management plan was ripe notwithstanding that no specific timber sale had yet been approved pursuant to the plan); *Friends of the Wild Swan, Inc. v. United States Forest Service,* 910 F.Supp. 1500, 1507–08 (D.Or.1995) (agency's failure to act can itself be a final agency action).

■ A second consideration is whether the case involves "uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Dodd v. Hood River County,* 59 F.3d 852, 860 (9th Cir. 1995). This requirement ensures that the court is not issuing an advisory opinion, or wasting judicial resources on disputes that are merely speculative.

■ A third consideration is the extent to which resolution of the claim turns on the specific facts, particularly facts that are disputed or as yet undetermined. Given the comparatively limited role that the courts have in reviewing administrative agency actions, by the time the case reaches the courts the necessary factual record ordinarily should be developed and the issues before the court should mostly be legal. *See Freedom to Travel Campaign v. Newcomb,* 82 F.3d 1431, 1434 (9th Cir.1996). The matter may be unripe if the court's review would be illuminated by the development of a better factual record. *Freedom to Travel Campaign,* 82 F.3d at 1431; *Dodd,* 59 F.3d at 860. By contrast, "pure" questions of law that require little factual development are generally deemed to be fit for review. *Id.*

■ A fourth consideration is the presence or absence of adverseness, such that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant a decision by the court. *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ A final consideration is the hardship to the parties of postponing judicial review.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967).

■ The exhaustion requirement is related to ripeness. As a general rule, no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The agency ordinarily should be permitted to complete its procedures, develop the record, correct its own errors, and apply its special expertise before the matter is reviewed by the courts. The exhaustion requirement also ensures that the court is reviewing the final agency decision, and not a preliminary decision. In addition, until the prescribed administrative remedies have been exhausted there ordinarily is no imminent injury and the plaintiffs' cause of action is only speculative. However, exhaustion of administrative remedies is not required if those remedies are inadequate or not efficacious, or where pursuit of administrative remedies would be a futile gesture. *Air One Helicopters, Inc. v. Federal Aviation Admin.,* 86 F.3d 880, 882 (9th Cir.1996).

■ In deciding whether there was a "final" decision by the Corps, the record must usually speak for itself. As a general rule, the court will not inquire into the minds of the agency officials to determine what they actually intended, though there are some exceptions to that rule. The court may of course consider judicial admissions by a party. The converse is also true. With limited exceptions, agency officials may not offer testimony to contradict, supplement, or explain the written record. The court must assume the officials said what they meant, and meant what they said.

■ Notwithstanding defendants' assertion that it had made no final decision, the only reasonable conclusion that can be drawn from the words of the Notice of Intent published by the Corps on or about September 17, 1996, is that the Corps had indeed made a number of "final" decisions, including:

(1) that it would assert jurisdiction over and take custody of the remains;

(2) that the remains were of Native American ancestry;

(3) that the remains were subject to NAG-PRA;

(4) that the remains were discovered inadvertently on Federal land;

(5) that the land on which the remains were discovered is recognized as the aboriginal land of an Indian tribe;

(6) that there is a relationship of shared group identify which can be reasonably traced between the human remains and five Columbia River basin tribes and bands;

(7) that the remains should be turned over to a tribe for burial.

I have focused upon the Notice of Intent published by the Corps, since that is the official position the agency published for all to see. However, I note that the sworn affidavit of Lt. Colonel Donald R. Curtis, which defendants previously submitted to this court, is consistent with the conclusion that the agency had made the above-enumerated decisions.

During the October 23, 1996, hearing before this court, defendants also left little doubt that they had decided the remains were Native American, were subject to NAG-PRA, and should be repatriated pursuant to that statute. (Tr. 39–41, 45, 48.) Indeed, defendants framed the issue remaining before the Corps as a determination of which claimant is "the closest culturally affiliated" to the remains. (Tr. 48–49). "[T]he important thing is the issue of closest cultural affiliation must be decided." (Tr. 50.) Notably, those standards have little relevance outside the context of NAGPRA.

The memorandum that defendants filed in opposition to the motion for a temporary restraining order is also instructive:

Until the Corps reviews [the claims that have been filed by other tribes] and determines *to which claimant the remains should be repatriated,* which claimant has the closest cultural affiliation, the Corps will not transfer custody.

Federal Defendants' Opposition to Motion for Temporary Restraining Order at 12 (emphasis added.) In the same memorandum, defendants also asserted that:

[T]he public interest will be served [by denying the motion for a restraining order] in that Congress' objective announced in NAGPRA, i.e., efficient and expeditious repatriation *can only occur if the repatriation process is permitted to proceed. An injunction would prevent the completion of this repatriation process.*

*Id.* at 13, fn. 3 (emphasis added). Finally, I note that in their response to interrogatories filed with this court, defendants asserted that:

d. Despite their antiquity, *the remains fall within the ambit of the Native American Graves Protection and Repatriation Act.*

Defendant's Response to Plaintiffs' Interrogatories at 3 (emphasis added.) In light of the statements made in the Notice of Intent, which statements were subsequently reiterated in sworn affidavits and sworn responses to interrogatories, and reiterated again during oral argument and in defendants' pleadings, it is clear that defendants had decided that the remains were Native American, were subject to NAGPRA, and should be repatriated pursuant to NAGPRA. The only decision that remained on September 17, 1996, was the determination as to which Native American tribe would receive the remains. The Corps had designated certain tribes to which it intended to give the remains unless another tribe contested that portion of the decision by filing a claim prior to October 23, 1996.

In the Notice of Intent, the Corps did not offer any opportunity for interested persons to contest the determination that the remains were subject to NAGPRA and should be turned over to a tribe. Nor was anyone other than a Native American tribe invited to file a claim to the remains. There is no evidence before me to suggest that the Corps even responded to the letters from the scientists (and from their attorney) until months after this lawsuit was filed. From the standpoint of the plaintiffs, the agency's decision was a final agency action that was dispositive

of the plaintiffs' rights and interests in this matter.[6] Had plaintiffs not filed this lawsuit when they did, it appears from the documents before this court that the remains would already have been turned over to the Umatilla tribe or perhaps to another Native American tribe.

Defendants have indicated they may be re-evaluating their position with respect to several matters in this case. They are free to do so. However, that does not affect my determination that there is currently a final agency action that is reviewable by this court.

During oral argument, defendants suggested that NAGPRA does not provide for a "two-level" decision making process. According to defendants, the Corps does not first determine whether the remains are Native American and subject to NAGPRA, and then decide which tribe or individuals are entitled to receive the remains. Rather, if any human remains are found, the Corps attempts to find the person or persons that have a relationship to those remains so custody may be transferred to the appropriate party. Defendants contend the process followed in this case was no different than if the remains of a serviceman had been found. In their view, NAGPRA does not create a special procedure to be utilized for Native American remains, but simply requires equal treatment, "a transfer of custody to Native Americans as there was with others."[7]

According to the Corps, any Indian tribe that believes it is culturally affiliated with the remains may file a claim, but so can persons other than Indian tribes. "[T]here is nothing ... to prevent a [non-Indian] group from coming in and establishing they have a link. Under some other statute." The Corps will investigate the claims and decide whether to accept any of the claims. If the Corps cannot determine the appropriate culturally affiliated group, "then there is no disposition under NAGPRA. It's not a question of a two level decision; it's one decision." If no claim is determined to be valid, then the bones remain in federal custody and the eventual disposition is determined by other statutes that may apply (though the Corps was vague about just what those statutes are).[8]

I cannot accept defendants' "one decision" analysis. It is not supported by either the language of the regulations promulgated by the Secretary of Interior[9] or the administrative record in this case. NAGPRA is not a general statute for disposing of human remains found on federal lands, but is concerned only with Native American remains and related objects. 25 U.S.C. § 3002(a). The enabling regulations "develop a systematic process for determining the rights of lineal descendants and Indian tribes and Native Hawaiian organizations to certain Native American human remains, funerary objects, or objects of cultural patrimony with which they are affiliated." 43 C.F.R. § 10.1(a).

---

6. The enabling regulations acknowledge that "[t]hroughout these regulations are decision points which determine their applicability in particular circumstances ..." 43 C.F.R. § 10.1(B)(3). Those regulations state that a determination that an object is not subject to NAGPRA constitutes a final decision that may be reviewed by the court. However, the regulations ignore the reality that a decision that an object is subject to NAGPRA may also constitute a final decision from the perspective of that determination.

7. *But cf.* 25 U.S.C. § 3010 (the procedures established by NAGPRA reflects the unique relationship between the Federal Government and Indian tribes and should not be construed to establish a precedent with respect to any other individual, organization or foreign government).

8. Defendants also asserted during oral argument that "there is a responsibility under NAGPRA 43 C.F.R. 10.4 that requires anybody that has

knowledge of an inadvertent discovery on federal lands to notify the agency. And this is not limited to Native American remains under that regulation." That is incorrect. The term "human remains" is expressly defined for purposes of the NAGPRA regulations as "the physical remains of a human body of a person of Native American ancestry." 43 C.F.R. § 10.2(d)(1). Unless the remains are of Native American ancestry, the NAGPRA regulations are inapposite.

9. The Corps of Engineers is not interpreting its own regulations, but those promulgated by the Secretary of Interior. Consequently, it is not entitled to the deference that might be accorded to an agency's interpretation of its own regulations. *See United States Dept. Of Treasury v. Federal Labor Relations Authority,* 996 F.2d 1246, 1250 (D.C.Cir.1993).

The regulations do not apply to any other objects. 43 C.F.R. §§ 10.1(a), 10.2(d)(1).[10] Notwithstanding the contentions made during oral argument, it seems clear that the Corps would follow an entirely different set of procedures if this were the remains of a "serviceman." Nor do the regulations provide for non-indians to file a claim to the remains based upon "cultural affiliation." 43 C.F.R. §§ 10.2(b), 10.6(a). Rather, the concept of "cultural affiliation" with respect to human remains found on federal lands appears to be limited to the context of NAGPRA.

Likewise, the enabling regulations acknowledge the existence of "decision points." 43 C.F.R. § 10.1(b)(3). Notably, a determination that an object is not subject to NAGPRA or these regulations constitutes a final agency action that gives rise to a right to judicial review. *Id.* This contradicts the Corps' apparent contention that there is no dichotomy between items that are subject to NAGPRA and those that are not.

A determination that the remains or cultural objects are Native American and are subject to NAGPRA is a prerequisite to any decision as to which tribes are entitled to custody of the remains. *Cf.* 32 CFR § 229.3(a)(6) (regulations of the Department of Defense regarding archeological resources). The record in this case shows that the Corps specifically made that threshold determination and found that the remains were Native American, were subject to NAGPRA, and should be turned over to the appropriate Native American tribe.

I express no opinion as to whether there is any legal barrier that precludes the Corps from establishing a unified procedure to simultaneously evaluate both claims filed pursuant to NAGPRA as well as claims filed under some other statute or authority, or to simultaneously consider both the question of which tribe should receive the remains as well as whether any tribe should receive the remains. For purposes of this case, I decide only that it is not the procedure contemplated by the regulations the parties have cited to this court, and it is not the procedure that was followed in this case.

A related question is defendants' contention that this action should be dismissed on grounds plaintiffs failed to exhaust their administrative remedies. A petition for judicial review under the Administrative Procedures Act is not barred for failure to exhaust judicial remedies unless there is both a remedy to exhaust and recourse to that remedy is required by statute or agency rule. *Darby v. Cisneros,* 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).

Defendants have not called the court's attention to any administrative procedure by which plaintiffs could formally have contested the determination that the remains are those of a Native American or are subject to NAGPRA. Defendants have suggested that plaintiffs could have filed a "claim" pursuant to NAGPRA's enabling regulations. However, the regulations provide that only another Indian tribe, or a Native American[11] who can prove that he or she is a direct lineal descendant, and who claims ownership of the remains, can file a claim. 43 C.F.R. § 10.2(b) ("Who has standing to make a claim under these regulations?"); 43 C.F.R. § 10.6(a). None of the plaintiffs are an Indian tribe or Native American, nor do any of them claim to be a direct lineal descendant of the man. Indeed, the *Bonnichsen* plaintiffs do not

---

**10.** During the notice and comment period prior to adoption of the enabling regulations, it was suggested that the regulations be clarified so it was clear that they applied only to Native American human remains, and not to others such as "Mountain Men" or early settlers. The Secretary of Interior declared that such language was unnecessary. "The language has not been changed as all provisions of these regulations apply only to Native American human remains ..." 60 Fed. Reg. 62141 (Dec. 4, 1995). The Secretary also rejected a proposal to revise the regulations to include all human remains, not just those of Native Americans. "The Act is designed specifically to address the disposition or repatriation of Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony and not to cover all human remains." 60 Fed. Reg. 62137 (Dec. 4, 1995).

**11.** The statute and regulations contain similar provisions for claims by native Hawaiians and their organizations. Those provisions are not at issue in this case and therefore will be omitted for purposes of this opinion.

claim any personal right to "ownership" of the remains, per se.

43 C.F.R. § 10.15(c) does provide that:

"No person is considered to have exhausted his or her administrative remedies with respect to the repatriation or disposition of human remains ... subject to subpart B of these regulations, or, with respect to Federal lands, subpart C of these regulations, until such time as the person has filed a written claim for repatriation or disposition of the objects with the responsible museum or Federal agency and the claim has been duly denied following these regulations."

However, I do not find that section to be dispositive. First, § 10.15(c) is predicated upon the assumption that the remains are subject to these regulations in the first place. That is the very issue that plaintiffs desire to contest.

■ Second, the requirement that a person file a "claim" for repatriation or disposition makes sense only if that person is seeking repatriation or disposition of the remains. It is meaningless in the context of someone who is *opposing* repatriation or disposition, and not merely claiming a superior right to the remains pursuant to NAGPRA. *See also* 43 C.F.R. § 10.15(a)(1) (a person who fails to make a claim "is deemed to have irrevocably waived any right *to claim such items pursuant to these regulations or the act.*" (emphasis added)). Accordingly, I read § 10.15(c) to apply only to persons who are asserting a right to the remains under NAGPRA.

Finally, as noted above, the regulations do not allow "any person" to file a claim. On the contrary, only another Indian tribe, or a Native American who can prove that he or she is a direct lineal descendant, and who claims ownership of the remains, may file a claim. 43 C.F.R. § 10.2(b) ("Who has standing to make a claim under these regulations?"); 43 C.F.R. § 10.6(a). In addition, the evaluation of such "claims" under these regulations appears to be limited to the specific issues in 43 C.F.R. §§ 10.6 and 10.14, which do not include the issues that plaintiffs desire to contest. There is little point in requiring plaintiffs to file a "claim" when the applicable regulations do not provide for consideration of their claim or consideration of the issues that would be asserted in such a claim.

I conclude that this action is not barred for failure to exhaust administrative remedies. Defendants have not shown that there was an administrative remedy available to plaintiffs and that they were required to use that remedy. *Darby,* 509 U.S. 137, 113 S.Ct. 2539. Alternatively, exhaustion of any limited remedy that was available would have been a futile gesture. *Air One Helicopters,* 86 F.3d at 882.

■ In summary, I find that the Corps made a number of final decisions in this case, as enumerated above, that those decisions constituted a final agency action that is reviewable by this court, and that this action is not barred on grounds plaintiffs failed to exhaust their administrative remedies. Although those findings effectively dispose of defendants' motion to dismiss for lack of jurisdiction, I will briefly consider the remaining factors that enter into the ripeness calculation.

Most of the claims in this case require little if any factual development, e.g., the constitutionality of the Act, or issues of statutory interpretation. That is an additional factor favoring immediate judicial review. A primary purpose for requiring the exhaustion of administrative remedies and for waiting until there is a final agency action is so the agency may develop a complete factual record, and apply its special expertise. When the issue before the court concerns the constitutionality of the statute, or the statutory authority of the administrative agency, there is no reason for such deference. The Corps of Engineers has no special expertise, as compared to the courts, in the art of interpreting statutes or the United States Constitution. *See State of California ex rel. State Water Resources Control Board v. Federal Energy Regulatory Commission,* 966 F.2d 1541, 1561–62 (9th Cir.1992) ("It is difficult to postulate an issue more proper for judicial decision than that of the statutory authority of an administrative agency"); *Steamboaters v. FERC,* 759 F.2d 1382, 1387–88 (9th Cir. 1985). *See also Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1381 (9th Cir.1986) (claim

is fit for review if the issues raised are primarily legal and do not require further factual development and the challenged action is final).

The other ripeness factors also favor immediate judicial review. The interference, if any, with the agency's decision-making process is minimal. Despite argument to the contrary, it is clear that the agency has already made its decision. The sole remaining question still before the agency was which tribe would receive the remains, and that is a matter which did not concern these plaintiffs. They object to any tribe receiving the remains. There is adversity between parties with adverse legal interests. From the standpoint of the plaintiffs, the threatened injury is real and imminent, not speculative or contingent.

The final consideration is the hardship to the parties of postponing judicial review. If this action were dismissed now, the Corps could decide to give the remains to the tribes for burial without any notice to plaintiffs, an action that would moot this controversy and deny plaintiffs their day in court.[12] Regardless of what one believes should be the proper outcome of this case, the right to due process of law and to an opportunity to argue one's case is a fundamental principle of American jurisprudence.

A prompt judicial determination is not inconsistent with the interests of the Corps. This is a new statute. There is almost no case law interpreting this statute under any circumstances, let alone the unique circumstances presented in this case. The Corps (and other agencies) may benefit from the court's guidance on the proper interpretation and application of the statute.

Finally, those who seek to have the remains returned to the tribes for burial might also benefit from a prompt judicial decision. They cannot find much consolation in the remains being stored in a vault at a laboratory. Indeed, it is that image of Indian skeletons reposing in museum and agency vaults that was a principal motivating factor that induced Congress to enact NAGPRA. *See, generally,* Trope and Echo–Hawk, "The Native American Graves Protection and Repatriation Act: Background and Legislative History," 24 Ariz. St. L. J. 35 (1992). The resolution of the issues presented by this case is in the interests of all concerned.

The court has jurisdiction over this matter. The motions to dismiss for lack of jurisdiction are denied. ·

**2. Claims under 42 U.S.C. § 1981 and § 1983**

 Defendants move to dismiss these claims on grounds these statutes furnish a remedy only against action taken under color of state law, not federal law. That clearly is true of 42 U.S.C. § 1983.[13] Although plaintiffs try to support their § 1983 claim with vague allegations (which reside mainly in their briefs, rather than in their complaint) that the federal agencies are working in concert with state and local officials, and thus there is some "conspiracy," they simply fail to state a claim for relief under § 1983. Moreover, even assuming plaintiffs have alleged a "conspiracy" between federal and state officials, the federal officials were allegedly acting under color of *federal* law, not state law. That is a fatal flaw. I therefore grant defendants' motion to dismiss the § 1983 claims.

---

12. Defendants have voluntarily agreed to provide 14 days notice before transferring the remains. Though I do not doubt their sincerity, it nonetheless in itself is not a legally enforceable obligation. This court previously issued an order incorporating that agreement, but that order would not survive the dismissal of this case. During oral argument, defendants suggested that they might be obliged to issue another public notice, but then acknowledged that further notice would be required only if the Corps changed its original decision and had to issue a new notice of intent. If the Corps decided to proceed with its original decision, no further notice would be required.

13. That statute provides, in relevant part, that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The interpretation of 42 U.S.C. § 1981 is more problematic.[14] Neither side has cited convincing authority to support its position, and what little authority there is may have been superseded by the 1991 amendments to that law. I do not find the 1991 amendments to be clearly dispositive on their face. There are differing views regarding the interpretation of the amendments, resolution of which may itself depend upon how one interprets the law as it existed prior to the amendments. The courts are only first beginning the process of ascertaining the full significance of those changes. *Cf. Federation of African American Contractors v. City of Oakland,* 96 F.3d 1204 (9th Cir.1996).

Fortunately, we need not reach that issue to decide this case. Defendants were acting under color of another federal law, NAGPRA. Plaintiffs seek injunctive and declaratory relief, not monetary damages. Consequently, there are only three potential scenarios:

1. To the extent defendants allegedly failed to follow NAGPRA or its enabling regulations, or acted arbitrarily and capriciously or contrary to law, plaintiffs have a remedy under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.,* and perhaps 25 U.S.C. § 3013 as well. (That issue is discussed below.) Since plaintiffs already have alleged such claims, a § 1981 claim is simply redundant.

2. To the extent defendants have followed NAGPRA, but plaintiffs contend its terms conflict with the provisions of 42 U.S.C. § 1981, plaintiffs have no remedy. If there is an irreconcilable conflict between NAGPRA and 42 U.S.C. § 1981, NAGPRA—which was more recently enacted and is specific—will undoubtedly prevail over § 1981, which dates from the Civil War and is general in nature. *See Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (where Congress enacts a specific act that is in irreconcilable conflict with an earlier general statute, the earlier act is implicitly repealed to the extent of such conflict.) Indeed, it is somewhat paradoxical to speak of violating one federal law under color of another federal law.

3. The final possibility is that NAGPRA or the regulations implementing it are unconstitutional. That is really the thrust of plaintiffs' § 1981 claims. However, there is no need for plaintiffs to resort to 42 U.S.C. § 1981 in order to assert that argument. Such a claim may be pursued directly via the Declaratory Judgment Act, 28 U.S.C. § 2201.

Accordingly, I grant the motion to dismiss plaintiffs' § 1983 claim. I will construe the § 1981 allegations as stating a claim for a declaratory judgment that NAGPRA and its enabling regulations are unconstitutional for the reasons asserted in the complaint. I grant defendants' motion to dismiss the § 1981 claim to the extent it alleges that NAGPRA violates § 1981, or alleges violations of the regulations and NAGPRA or other conduct that may be redressed pursuant to the Administrative Procedure Act or 25 U.S.C. § 3013. Plaintiffs may file amended complaints consistent with these rulings if they wish.

### 3. The merits of the constitutional claims

Defendants also have moved to dismiss plaintiffs' claims that NAGPRA is unconstitutional. Although there are occasions where the courts will choose to decide the constitutionality of a statute in the context of a motion to dismiss, I decline to do so here. The essence of a motion to dismiss under FRCP 12(b)(6) is that the complaint fails to state a claim. The defendant is saying, "Even if everything you say is true you still cannot prevail." Plaintiffs arguably have stated a claim that the statute or enabling

---

**14.** 42 U.S.C. § 1981 provides, in relevant part, that:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

regulations are unconstitutional. The real question is whether there is any merit to their claim. I believe that question would better be addressed later in the proceedings. I therefore deny the motion to dismiss, but express no opinion upon the merits of those claims.

### 4. Private right of action under NAGPRA

■ Defendants contend (1) that there is no private right of action under NAGPRA, and (2) that the government has not waived sovereign immunity and consented to be sued. The statute appears to say the opposite:

> The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter.

25 U.S.C. § 3013. It is difficult to see how Congress could be more express than that. Section 3013 establishes a right to declaratory and injunctive relief to redress violations of NAGPRA.[15] The enabling regulations likewise assume that there is a private right of action under § 3013. *See* 43 C.F.R. § 10.1(b)(3) ("Any final determination making the Act or these regulations inapplicable is subject to review pursuant to [25 U.S.C. § 3013]"); 43 C.F.R. § 10.17 ("Any person who wishes to contest actions taken by . . . federal agencies . . . with respect to the repatriation and disposition of human remains . . . is encouraged to do so through informal negotiations," but also noting that "the United States District Courts have jurisdiction over any action brought that alleges a violation of the Act.") *See also Pueblo of San*

*Ildefonso,* 103 F.3d 936 (finding an express private right of action under NAGPRA).

■ Defendants also contend that there must be an express waiver of sovereign immunity on the face of the statute. However, the Ninth Circuit has previously found that such a waiver exists with respect to all claims for nonmonetary relief against the United States which allege that a federal agency or official "acted or failed to act in an official capacity or under color of legal authority . . ." *Presbyterian Church (USA) v. United States,* 870 F.2d 518, 523–26 (9th Cir.1989.)[16] This is such a claim. I therefore deny the motion to dismiss this claim.[17]

I also deny defendants' motion to dismiss for failure to state a claim for a violation of NAGPRA or its enabling regulations. The proper interpretation of the statute is not as clear as defendants suggest. Before interpreting the statute, I would also like to have a few matters clarified that the parties were unsure about during oral argument, such as (1) the circumstances under which Dr. Chatters obtained the ARPA permit and what items were removed pursuant to that permit, and (2) whether there are any other laws that may apply to these remains and the interplay between those laws and NAGPRA.

### CONCLUSION

Defendants' motion to dismiss (# 30) is granted in part and denied in part. This court has jurisdiction, and therefore denies the motion to dismiss on grounds of ripeness or failure to exhaust remedies. The § 1983 claim is dismissed for failure to state a claim. The court will construe the § 1981 allegations as stating a claim for a declaratory judgment that NAGPRA and its enabling regulations are unconstitutional for the rea-

---

15. I express no opinion as to whether § 3013 creates a private right of action to recover damages, since that issue is not before me.

16. *See also Chamber of Commerce v. Reich,* 74 F.3d 1322, 1328 (D.C.Cir.1996) (the waiver of sovereign immunity in 5 U.S.C. § 702 is not limited to actions under the APA). *Specter v. Garrett,* 995 F.2d 404, 410–11 (3d Cir.1993) (same).

17. An argument can be made in favor of an implied waiver of sovereign immunity in § 3013, since a primary purpose of NAGPRA is the repatriation of remains and other items that are in

the possession of federal agencies or that may be discovered on federal lands. However, § 3013 may also have been aimed at museums, which—unlike the federal agencies—would not be subject to the Administrative Procedure Act. *But cf.* 25 U.S.C. § 3007 (which provides for monetary penalties, and is expressly limited to a museum, which suggests Congress knew how to limit the application of a remedy when it desired to do so). I decline to decide that issue here. There is no need to resort to an implied waiver, since the Ninth Circuit has already decided that there is an express waiver of sovereign immunity under these circumstances.

sons asserted in the complaint. I grant defendants' motion to dismiss the § 1981 claim to the extent this claim alleges that NAGPRA violates § 1981, or alleges violations of the regulations and NAGPRA or other conduct that may be redressed pursuant to the Administrative Procedure Act or 25 U.S.C. § 3013. I deny the motion to dismiss the claims for violation of NAGPRA. Plaintiffs may file an amended complaint consistent with these rulings if they wish.

Although I have determined that this court has jurisdiction over the matter, and that the complaint is legally sufficient in that plaintiffs have stated a claim, that simply means that the court has jurisdiction to hear this controversy. I express no opinion as to the merits of plaintiffs' claims or the eventual outcome of this case.