**SAN CARLOS APACHE TRIBE, a federally recognized Indian Tribe; and Velazquez Sneezy; Steven Casa, and Elliott Talgo, Sr., members of the San Carlos Indian Tribe, Plaintiffs,**

v.

**UNITED STATES of America; and United States of America as Trustee for Gila River Indian Community, a federally recognized Indian tribe; and San Carlos Apache Tribe, a federally recognized Indian Tribe; Gale Norton, Secretary of the U.S. Department of the Interior; the U.S. Department of Interior; and Neil A. McCaleb, Director of the Bureau of Indian Affairs, a federal agency within the United States Department of the Interior; operating the San Carlos Indian Irrigation Project (SCIIP), for the benefit of the San Carlos Irrigation and Drainage District (SCIDD), Defendants,**

No. CV 99–255 TUC DCB.

United States District Court,
D. Arizona.

July 9, 2003.

864

John H Ryley, Esq, Joe P Sparks, Esq, Kevin T Tehan, Esq, Susan B Montgomery, Sparks Tehan & Ryley PC, Scottsdale, for San Carlos Apache Tribe of Arizona, a federally recognized Indian tribe, Velasquez Sneezy, Sr, members of the San Carlos Apache Tribe, Elliott Talgo, Sr, members of the San Carlos Apache Tribe plas.

Patrick Barry, U.S. Dept of Justice, Land & Natural Resources Division, Washington, DC, Don B Overall, U.S. Attorney's Office, Tucson, Rodney B Lewis, Esq, Gila River Indian Community, Pima–Maricopa Tribe Law Office, Sacaton, John T Hestand, Esq, Ofc of Water Rights, Gila River Indian Community, Chandler, Riney B Salmon, II, Esq, Lisa Michelle McKnight, Esq, Salmon Lewis & Weldon PLC, Phoenix, for United States of America, Gila River Indian Community, a federally recognized Indian Tribe, San Carlos Apache Tribe of Arizona, a federally recognized Indian tribe, Interior, Department of, San Carlos Irrigation Project District, for the benefit of the San Carlos Irrigation and Drainage District, dfts.

## ORDER

BURY, District Judge.

Plaintiffs, the San Carlos Apache Tribe (Apache Tribe) brought this action in 1999. They sought and were denied a Temporary Restraining Order and a Preliminary Injunction against Defendants the United States of America, the Secretary of the United States Department of the Interior, the Bureau of Indian Affairs (BIA) operating the San Carlos Indian Irrigation Project (SCIIP)[1] for the benefit of the San Carlos Irrigation and Drainage District (SCIDD) and the Gila River Indian Community (GRIC). The SCIDD and GRIC are interveners in this action.

Plaintiffs seek to enjoin the release of water from the San Carlos Reservoir ("Reservoir" or "Lake"), except for 10 cubic feet per second, until there is a minimum pool of 75,000 acre-feet of water in the Reservoir. The Reservoir sits on federal land, but lies within the San Carlos

---

1. Plaintiffs use the acronym "SCIP."

Apache Tribe Reservation. The Apache Tribe runs a concession operation for fishing and camping in and around the Lake that has provided revenues of half a million dollars up to in excess of two million dollars a year. The water in the Reservoir is subject to being drawn down for irrigation purposes every year, which jeopardizes the recreational activities at the Lake, especially when there are drought conditions in Arizona.

The Reservoir was completed in 1928, and the amount of water in it has fluctuated considerably depending on snow-pack, runoff, precipitation, carryover, and agricultural needs. The Reservoir has fallen below 75,000 acre-feet for all or part of 399 of the 720 months between 1937 and 1997. (GRIC SOF at A.) The Reservoir has been completely drained or drained below 1,000 acre-feet on 21 occasions between 1934 and 1995 because of a lack of water. (GRIC SOF at A.) The Reservoir has filled to overflowing 8 times during 5 different years. (GRIC SOF at A.) Since March of 1999, the Reservoir has been below 75,000 acre-feet for all or part of 27 of the 41 months. (GRIC SOF at A.) The Reservoir level was at 25,810 acre-feet October 8 and 9, 2000. (GRIC SOF at A.)

The Apache Tribe alleges that draining the Reservoir below 75,000 acre-feet of water will cause a "catastrophic fishkill" that under Section 9 of the Endangered Species Act (ESA) would constitute a taking of the following endangered and threatened species: Peregrine Falcon,[2] Razorback Sucker,[3] Spikedace,[4] Bald Eagle,[5] and Southwestern Willow Flycatcher.[6]

In addition to the Section 9–ESA claim, the Plaintiffs allege that there has been a material change in circumstances that justifies modification of the comprehensive management provisions for operating the Reservoir that are set out in the Gila River Decree, The Plaintiffs allege that the Defendants' release of water from the Reservoir violates the federal common law of public nuisance, the National Historic Preservation Act (NHPA), the Archeological Resources Protection Act (ARPA), the Native American Graves Protection and Repatriation Act (NAGPRA), the National Environmental Policy Act (NEPA), and the Fish and Wildlife Coordination Act (FWCA). Plaintiffs allege that Defendants have breached their federal trust responsibilities to the Apache Tribe.

This case was previously before the Honorable Alfredo C. Marquez. He issued an Amended Order on January 28, 2002, dismissing Plaintiffs' Section 7–ESA claim that Defendants failed to consult with the United States Fish and Wildlife Service (FWS) regarding the effects of drawing down the Reservoir for irrigation purposes. Judge Marquez based the dismissal on Plaintiffs' failure to satisfy the 60–day notice requirement for bringing a citizen suit under ESA. Subsequently, Judge Marquez refused to allow Plaintiffs to amend the Complaint to allege a new Section 7 claim because it would unduly delay the case, but he allowed amendment for newly appointed agency administrators to be substituted as named parties. On August 13, 2002, this case was reassigned to this Court. The First Amended Com-

---

**2.** Bird of prey.

**3.** Large Colorado River basin fish that can grow up to 13 pounds and lengths exceeding 3 feet.

**4.** Very small river-dwelling fish about three inches long that is native to the Gila River basin in New Mexico and Arizona.

**5.** Bird of Prey.

**6.** Small bird that migrates to Arizona in May and reproduces in riparian areas where there is moist soil to support its diet of small mosquito-type insects.

plaint has been filed, and it includes allegations of Section 7–ESA violations that must be dismissed in accordance with the law of the case as previously determined by Judge Marquez. The remainder of Plaintiffs' claims are presented for decision by summary judgment. The Court grants the Federal Defendants' Motion for Summary Judgment on all claims. The Interveners' Motions for Summary Judgment are moot.

### Background and History of the Case

The *Akimel O'Odham* (Pima) Indians are an agrarian people who were practicing irrigated agriculture before the Spanish arrived in North America. In the late 1700s, the *Peeposh* (Maricopa) Indians formed an economic and military confederation with the Pima Indians that prospered until the arrival of the Euro–Americans, who diverted the Gila and Salt Rivers away from the Confederation. Robbed of the water it needed to sustain its agriculture, the Pima and Maricopa Indians were reduced to poverty, malnutrition, and starvation.

In 1924, in an effort to rectify the loss of water, the United States Congress enacted the San Carlos Project Act, as follows:

**For the purpose, first of providing water for the irrigation of lands allotted to the Pima Indians on the Gila River Reservation,** Arizona, now without an adequate supply of water, and second, for the irrigation of such other lands in public or private ownership, as in the opinion of the Secretary, can be served with water impounded by said dam, without diminishing the supply necessary for said Indian land.

The San Carlos Project Act authorized construction of the Coolidge Dam and creation of the San Carlos Irrigation Project (SCIIP). The federal government purchased the land for the Coolidge Dam site from the Apache Tribe. Consequently, the dam sits on federal property, but lies within the confines of the San Carlos Apache Reservation. Prior to inundation of the Lake in 1928, the lake-bed was the site of the town of "old" San Carlos where the Apache Tribe resided. Additionally, the waters impounded behind Coolidge Dam cover tribal cemeteries, graves, and archaeology sites that contain and protect human remains, private homes, a grain mill, and many other historical sites, many of which have significant spiritual and cultural meaning to the Apache Tribe.

The federal government financed the construction of the Dam by equal reimbursement from the sale of Pima Indian-owned lands (GRIC) and implementation of a repayment plan to cover private lands (SCIDD) that would be served from the waters impounded by the dam. The Coolidge Dam was built near the confluence of the San Carlos and Gila Rivers, approximately 90 miles southeast of Phoenix, Arizona. The water flows from the Reservoir at Coolidge Dam down the Gila River for 68 miles and is diverted at the Ashurst–Hayden Diversion Dam to the Florence–Casa Grande Canal that delivers it to GRIC and SCIDD lands through a series of lateral and sublateral canals.

To secure the water supply for the SCI-IP, "the United States, on its own behalf and on the behalf of the Pima and Apache Indians (Lower Valley Users)," sued irrigation districts, canal companies, individual upstream farmers, cities and towns such as Safford and Mammoth, and mining operations such as ASARCO and Phelps Dodge (Upper Valleys Users) to determine the water rights of the water users along the Upper Gila River. *United States v. Gila Valley Irrigation District,* 454 F.2d 219, 220 (9th Cir.1972). There is a direct relationship between water use above Coolidge Dam (above ground and pumping diversions) and the amount of water in the

Reservoir available for release downstream to GRIC and SCIDD.

In 1935, the court entered a consent decree commonly called the Globe Equity 59 Decree ("Globe Equity Decree" or "Gila Decree"), bringing to a close the litigation initiated by the United States in 1925 against the users on the main stem of the Gila River. "The decree recognized that the rights of the Pimas below the reservoir were 'immemorial,' that is, prior to all others and that the rights of the Apaches above the reservoir were prior to all others, except the Pimas. The 1935 decree sets forth the full measure, extent, and limits of the rights of all the signatory parties and their successors in interest to divert and utilize the waters of the Gila River." *Id.*

The Globe Equity Decree established the right of the Pima Indians and SCIDD farmers to store water in the Reservoir, as follows:

> The right, as of the date of priority of not later than June 7, 1924,—and for the purposes of this decree **and for them** only as of said date -to store the waters of the Gila River in the San Carlos Reservoir of the aforesaid San Carlos Project ... and the right in that relation to accomplish and control the release from said reservoir of the waters so stored and thus reduced to ownership, and to conduct the same down the channel of the Gila River to the Ashurst–Hayden and Sacaton diversion dams of the San Carlos Project and there to recapture and divert and control the diversion of the same by means of said dams for conveyance in the canals leading therefrom to the above described 100,546 acres of the lands of said Project for the reclamation and irrigation thereof, and for the supplementation of amounts available therefore at said

dams from the natural stream flow under plaintiff's rights ....

(Decree at Article VI(5).)

Accordingly, Coolidge Dam is operated by BIA to serve as an agricultural water storage facility, with no legislative intent for the facility to serve flood control, recreation, or fish and wildlife functions. The purpose of the dam is to provide irrigation water through the SCIIP to approximately 50,000 acres of Pima Indian land (GRIC) and 50,000 acres of private non-Indian land (SCIDD). Under the Globe Equity Decree, a Gila Water Commissioner is charged to "run the river" (SCIIP). He operates a "call system" which determines how much surface water each party to the Decree may use on any particular day, which determines whether water is to be stored in or released from the Reservoir.

Since 1935 when the district court approved the Globe Equity Consent Decree, its meaning has been the subject of repeated litigation: *United States v. Gila Valley Irrigation Dist.,* 117 F.3d 425 (9th Cir.1997); *United States v. Gila Valley Irrigation Dist.,* 31 F.3d 1428 (9th Cir. 1994); *United States v. Gila Valley Irrigation Dist.,* 961 F.2d 1432 (9th Cir.1992); *United States v. Gila Valley Irrigation Dist.,* 959 F.2d 242 (9th Cir.1992) (unpublished); *United States v. Gila Valley Irrigation Dist.,* 454 F.2d 219 (9th Cir.1972); *Gila Valley Irrigation Dist. v. United States,* 118 F.2d 507 (9th Cir.1941); *United States v. Gila Valley Irrigation Dist.,* 804 F.Supp. 1 (D.Ariz.1992); *United States v. Gila Valley Irrigation Dist.,* 920 F.Supp. 1444 (D.Ariz.1941). Currently, the Globe Equity Decree is being overseen, interpreted, and enforced by the United States District Court for the District of Arizona, the Honorable John C. Coughenour, sitting by designation from the Western District of Washington.

Under the Globe Equity Decree, the water in the lake is owned by the BIA for the benefit of the SCIIP, the Pima Indians, and SCIDD. Consequently, in 1979, before the Apache Tribe could operate the San Carlos Lake as a fishing and camping recreational facility, the BIA had to agree to a Grant of Concession, which it did for a ten-year period. The Grant of Concession was extended to October 24, 1999, and since then the Apache Tribe has operated the Lake without the Grant of Concession.

Under the Globe Equity Decree, neither the Apache Tribe, the San Carlos Apache Indian Reservation, nor any individual Apache Indians have any right to store water in the Reservoir. *United States v. Gila Valley Irrigation District*, 31 F.3d 1428, 1431 (9th Cir.1994). Consequently, in 1992, Congress had to enact Pub.L. 102–575, the San Carlos Apache Tribe Water Rights Settlement Act of 1992, to allow the Apache Tribe to store water in the Reservoir. Congress provided for the Apache Tribe to exchange Central Arizona Project (CAP) water allocations [7] in place of irrigation water releases from the Reservoir and granted the Apache Tribe permission to store the "exchanged" reserves in the Reservoir to maintain a permanent pool of water for fish, wildlife, recreation and other purposes. Pub.L. 102–575 at § 3704(e). The San Carlos Apache Water Rights Settlement Act became effective in 1999, establishing permanent water storage rights in the Reservoir for the Apache Tribe.

### Standard on Summary Judgment

On summary judgment, the moving party is entitled to judgment as a matter of law if the Court determines that in the record before it there exists "no genuine issue as to any material fact." Fed. R.Civ.P. 56(c). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment because the requirement is that there be no *genuine issue of material fact. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is any factual dispute that might effect the outcome of the case under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. A factual dispute is genuine if the evidence is such that a reasonable jury could resolve the dispute in favor of the non-moving party. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact, but is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party satisfies its burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. A party opposing a motion for summary judgment cannot rest upon mere allegations or denials in the pleadings or papers, but instead must set forth

---

**7.** Congress enacted the San Carlos Apache Tribe Water Rights Settlement Act of 1992, Public Law 102–575, pursuant to a settlement agreement in General Adjudication of the Gila River System and Source, which litigated water rights claims between the Apache Tribe and non-Indian communities. Pub.L. 102–575 at § 3702. The Act approved, ratified, and confirmed the Agreement and authorized and directed the Secretary of the Interior to execute and perform the Agreement, *id.*, which involved the annual reassignment to the Apache Tribe of CAP water apportionments previously held by the Ak–Chin Indian Reservation (22,000–33,000 acre-feet of water), Phelps Dodge Corporation (14,655 acre-feet of water) and Globe (3,480 acre-feet of water) to the Apache Tribe. *Id.* at § 3702. In combination with the Apache Tribe's 1981 CAP apportionment of 12,700 acre-feet of water, the Apache Tribe has approximately 52,838 to 63,838 acre-feet of water available to it, annually, to store in the San Carlos Reservoir.

specific facts demonstrating a genuine issue for trial. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. "If evidence is merely colorable ... or is not significantly probative, summary judgment may be granted." *Eisenberg. v. Insurance Co. of North Am.,* 815 F.2d 1285, 1288 (9th Cir.1987). In determining whether to grant summary judgment, the Court views the facts and inferences from these facts in the light most favorable to the non-moving party. *Matsushita Elec. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 577, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The Judge's role on a motion for summary judgment is not to determine the truth of the matter or to weigh the evidence, or determine credibility, but to determine whether there is a genuine issue for trial. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* The inquiry mirrors the standard for a directed verdict: whether the evidence presented reveals a factual disagreement requiring submission to a jury or whether evidence is so one sided that one party must prevail as a matter of law.

### Section 9 of ESA: Take of an Endangered or Threatened Species

Before reaching the merits of Plaintiffs' Section 9 claim, the Court must address two jurisdictional issues: the 60–day citizen suit notice requirement and standing.

#### a. 60–day citizen suit notice provision

ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). The Court observed, "Congress intended endangered species to be afford-ed the highest of priorities [in order to] halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184, 98 S.Ct. 2279. The broad sweeping, all encompassing requirements of ESA are accompanied by a citizen suit provision that allows private citizens to sue the United States and its agencies for substantive violations of the ESA. *Bennett v. Spear,* 520 U.S. 154, 173, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); 16 U.S.C. § 1540(g)(1). No such action, however, may commence until at least 60 days after written notice has been given to the agency.

The 60–day notice period is designed to afford the agency an opportunity to review its actions and take corrective measures if needed. *Southwest Center for Biological Diversity v. United States Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998). The 60–day notice period presents a chance for "settlement or other resolution of a dispute without litigation." *Id.* The 60–day notice requirement is jurisdictional. *Marbled Murrelet v. Babbitt,* 83 F.3d 1068, 1072 (9th Cir.1996); *Save the Yaak Comm. v. Block,* 840 F.2d 714, 721 (9th Cir.1988).

The notice given here was in the form of a letter dated July 3, 1997. (Federal Defendants' 19 Exhibits filed August 9, 2001 (19 Exhibits), Ex. 9(D): letter of July 3, 1997.) Plaintiffs filed this case on May 10, 1999, seeking a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction.

The July 3, 1997, letter notified the Secretary of the Interior that an emergency condition existed within the San Carlos Apache Reservation with respect to the following endangered species: Bald Eagle, Peregrine Falcon, Razorback Sucker, and Southwestern Willow Flycatcher. The paragraph in the letter noticing the Section 9 claim is as follows:

The present drawdown of San Carlos Lake impounded by Coolidge Dam on the Gila River within the San Carlos Apache Reservation places the above-referenced species at imminent risk and constitutes a "taking" under Section 9 of the Endangered Species Act as well as an "action" authorized, funded or carried on by [an agency of United States] "... likely to jeopardize the continued existence of any endangered species or result in the adverse modification of habitat of such species ..." with proper consultation. 16 U.S.C. § 1536(a)(2).

(Plaintiffs' Exhibits in Support of Consolidated Response and Statement of Facts ... (Plaintiffs' Exhibits), Ex. 23: Notice of Intent to Sue at 1) (emphasis added). As suggested by the emphasized language, Intervener SCIDD argues that the Letter of Notice limited Plaintiffs' complaints to the circumstances that existed in 1997.

SCIDD argues that "[a]fter receiving the letter from the Tribe, Secretary Babbitt, in collaboration with others, secured unused CAP water supplies for the 1997 year, which were stored in the Reservoir, thereby alleviating Plaintiffs' stated concerns regarding impacts on threatened and endangered species." (SCIDD MSJ at 4; SOF at ¶ 21.) SCIDD concludes, "[t]he Tribe cannot use a letter addressing reservoir conditions in 1997, which were ultimately alleviated, to justify a lawsuit addressing conditions on the lake in 1999." (SCIDD MSJ at 4; SOF at ¶ 22.)

It is, however, equally true that after receiving the letter from the Tribe, the Federal Defendants participated in ongoing communications with Plaintiffs and other concerned parties to develop possible long-term solutions to the problems associated with low Lake levels and BIA's practice of draining the Lake to satisfy the calls of downstream irrigators. The BIA recognized that it "was imperative that such discussions begin now to avoid the kind of crisis reaction that occurred last summer." (Plaintiffs' Exhibits, Ex. 24: Letter of BIA Area Director Barry Welch (Welch letter) of February 12, 1998.) BIA briefing papers consistently presented the issue for resolution as the "operation of Coolidge Dam and San Carlos Reservoir by Bureau of Indian Affairs, San Carlos Irrigation Project in compliance with [the Globe Equity Decree], without undermining the Reservoir sports fishery concession, and in compliance with applicable federal environmental laws." (Plaintiffs' Exhibits, Ex. 25: February 1998 BIA Briefing Paper at 1.) Neither the Federal Defendants nor GRIC challenge the sufficiency of Plaintiffs' 60–day Letter of Notice.

In addition to the immediate emergency situation addressed in the Letter of Notice, Plaintiffs claimed that "The Secretary's failure to properly manage and regulate the storage and release of water in the San Carlos Lake to maintain adequate water to safely preserve the fish population ..." threatened the Razorback Sucker which likely lived in the Lake and that "[t]he death and decay of millions of pounds of fish threaten Bald Eagle, Peregrine Falcon and Southwestern Willow Fly Catcher with loss of food source and exposure to disease." (Plaintiffs' Exhibits, Ex. 23: Notice of Intent to Sue at 2.) The Letter of Notice noted that "The Tribe [had] previously requested your help and the assistance of the President in protecting these endangered species, the sport fisheries in the Lake, archeological and Tribal burial sites, and public health, which also are at imminent risk from the drawdown of San Carlos Lake." *Id.* Finally, the Letter of Notice concluded with, "You are requested to take emergency measures and actions necessary pursuant to the Endangered Species Act of 1973, ... to protect and preserve these endangered and threatened species. You are requested to

issue an emergency order to prevent the drawdown of San Carlos Lake below 60,-000 acre feet." *Id.*

As the Letter of Notice suggests when read in its entirety, the drawdown problem at San Carlos Lake was not a new problem arising in 1997. It had been "previously" brought to the attention of Defendants and the President. The Plaintiffs' complaint that Defendants failed to properly manage and regulate the storage and release of water in the San Carlos Lake to maintain adequate water to safely preserve the fish population reaches beyond the mere emergency situation faced in 1997. Just because Plaintiffs complained that the Defendants' ongoing operations posed an immediate threat, as of July 3, 1997, to the named species cannot make the notice inadequate for the purpose of challenging the ongoing operation of the Reservoir.

There was nothing unique about the 1997 drawdown or draining of the Lake. There was nothing unique about the 1997 operation of the Lake. It was the ongoing operation of the dam and the repeated drawdowns of the Lake that Plaintiffs were challenging. The drawdown or draining of the Lake in 1997, like any other drawdown or draining of the Lake in any other year, created a reasonable certainty of imminent harm to support a "taking" claim under Section 9 of the ESA.

Because Plaintiffs provided the Defendants with a 60–day notice of its intent to sue, Plaintiffs may proceed with its Section 9 claim under ESA. Plaintiffs have standing to proceed under the citizen suit provision of ESA. The Court rejects SCIDD's standing challenge.

### b. *"Take" under Section 9 of the ESA*

Count One of the First Amended Complaint alleges that the drawdown of water from the Reservoir below 75,000 acre-feet will constitute a take of the Razorback

Sucker, Spikedace, Bald Eagle, Peregrine Falcon, and Southwestern Willow Flycatcher. Plaintiffs allege that the drawdown will result in a violation of Section 9 of the ESA by significantly harming and degrading the habitat for those species, resulting in a "take" of those species.

The Federal Defendants assert that this claim should be dismissed and summary judgment should be granted in favor of them because the undisputed facts demonstrate that there has not been and will not be a "take" of any of the identified endangered species. Defendants assert that the Plaintiffs have not made a sufficiently probative showing that a "take" of an endangered species has occurred pursuant to the requirements of Section 9 of the ESA.

Section 9 of the ESA makes it unlawful for any "person" to conduct certain prohibited activities with regard to an endangered or threatened species, including "taking" the species or "violat[ing] any regulation pertaining to such [endangered species." 16 U.S.C. § 1538(a)(1). "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* at § 1532(19). "Harm in the definition of 'take' in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification, or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3 (emphasis added). So long as the injury to wildlife occurs, either in the past, present, or future, the injury requirement in the definition is satisfied. *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995).

"[H]abitat modification does not constitute harm unless it 'actually kills or injures wildlife.'" *Arizona Cattle Grow-*

ers' Ass'n v. United States Fish & Wildlife, 273 F.3d 1229, 1238 (9th Cir.2001) (quoting Defenders of Wildlife v. Bernal, 204 F.3d 920, 924–25 (9th Cir.1999)); see also Rosboro Lumber Co., 50 F.3d at 784. Thus, habitat degradation, by itself, does not equal harm. To show that habitat modification constitutes "harm" under ESA, Plaintiffs must show "a reasonably certain threat of imminent harm to a protected species." Bernal, 204 F.3d at 925. A "potential injury" to wildlife is insufficient to constitute harm. Rosboro Lumber Co., 50 F.3d at 784–86. Thus, "harm" can be realized through the modification or degradation of a listed species' habitat where it is shown that such modification or degradation, indirect or prospective, will either kill or injure wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering. 50 C.F.R. § 17.3; see: Marbled Murrelet, 83 F.3d at 1064 (finding reasonable certainty of imminent taking); Greenpeace v. Nat'l Marine Fisheries Serv., 106 F.Supp.2d 1066 (W.D.Wash.2000) (finding that Alaskan fisheries' operations may constitute taking of the Steller sea lion where fisheries are catching fish normally eaten by the sea lion); Bensman v. United States Forest Service, 984 F.Supp. 1242 (W.D.Mo.1997) (holding that removal of dead trees used by the Indiana bat for habitat and hibernation may constitute taking).

Plaintiffs assert that it has demonstrated that the likelihood of a "take" is very real as to the Bald Eagle, the Southwestern Willow Flycatcher, and the Razorback Sucker. Although Plaintiffs included allegations in its Amended Complaint pertaining to the Spikedace and Peregrine Falcon, it offers no evidence nor any argument in its Response to counter Defendants' assertion that summary judgment should be granted as to these two species.[8]

In June of 1998, the BIA/SCIIP completed a Biological Assessment (BA) of whether the ongoing operation of the Coolidge Dam was likely to affect endangered or threatened species, specifically, the Bald Eagle, the Southwestern Willow Flycatcher, and the Razorback Sucker. (19 Exhibits, Ex. 17: Biological Assessment, June 1998.)

Preparation of the BA was done pursuant to Section 7 of the ESA that requires every Federal agency, in consultation with the Fish and Wildlife Service (FWS) to "insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an agency action) is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...." 16 U.S.C. § 1536(a)(2). The proscription extends to "all activities or programs of any kind," and includes "actions directly or indirectly causing modifications to the land, water or air." 50 C.F.R. § 402.02.

An agency proposing to take an action must inquire whether any endangered or threatened species "may be present" in the area of the action. When there exists a chance that such species may be present, the agency must conduct a BA to determine whether or not the species may be affected by the action. See 16 U.S.C. § 1536(c)(1) (pertaining to agency actions where no contract for construction has been entered into and no construction begun). If the proposed agency action is not

---

**8.** The Spikedace is not found in the Reservoir nor in the Arizona portion of the Gila River upstream from the Reservoir, though they may be present in the mainstream of the Gila River in New Mexico. The Peregrine Falcon was removed from the Federal List of Endangered and Threatened Wildlife, effective August 25, 1999.

a "major construction activity," the BA is not required and the agency may make an independent evaluation of whether the action "may affect" a listed species. 50 C.F.R. 402.14(a). These steps serve as a screening function to determine whether successive steps are required. *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir.1985).

Answers in the affirmative required the agency to enter into formal consultation with FWS. 50 C.F.R. 402.14(a). Alternatively, an agency may satisfy its obligation to consult by either preparing a BA even if one is not required and seeking concurrence from FWS or by entering into informal consultation with FWS. *Id.* at § 402.13. The purpose of both the BA and the informal consultation requirements is to determine whether the proposed action is likely to affect listed species or critical habitat. In either event, only the conclusion of "no likely adverse affect" terminates the agency's duty to formally enter § 7 consultation. *Id.* If it is determined that a threatened or endangered species "is likely to be affected" or that the agency action "may affect" a threatened or endangered species, formal consultation is required. *Id.* at § 402.14.[9]

Here, the BIA/SCIIP voluntarily prepared the BA for its ongoing operation of Coolidge Dam. The BA noted that there was a potential for adverse impact on the named species, but concluded that the probability for such impacts was "low for bald eagle and spikedace, extremely low for peregrine falcon, and is unknown for razor back sucker and Southwestern willow flycatcher." (19 Exhibits, Ex. 17: BA at 18.) The BIA/SCIIP failed to submit its conclusion that the ongoing SCIIP operation was "not likely to adversely affect" any listed species to FWS for concurrence, but as already noted herein that claim is barred by law of the case. This does not, however, bar the information and conclusions contained in the BA from being relied on by the Government to support its position that the ongoing operation of the Dam will not result in a taking of the Bald Eagle, the Razorback Sucker, and the Southwestern Willow Flycatcher.

According to the BA, "operation of the lake is not known to have significantly affected any of five species listed above since they were listed as threatened or endangered." [10] (19 Exhibits, Ex. 17: BA at 18.) "The impacts discussed in the BA [were] those that may potentially occur due to drawdown of reservoir volumes to the point where a major fish kill occurs." *Id.*

9. Once the agency enters formal consultation, the FWS must issue a biological opinion evaluating the nature and extent of the effect of the agency action on the endangered or threatened species. *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054 n. 8 (9th Cir. 1994). Where the biological opinion concludes that the proposed action is likely to jeopardize a protected species or adversely modify critical habitat, the agency must modify its proposed action. *Natural Resources Defense Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir.1998). In this instance, the FWS may suggest "reasonable and prudent alternatives to the proposed action." *American Rivers v. National Marine Fisheries Service*, 126 F.3d 1118, 1122 (9th Cir.1997) (*citing* 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3)).

In this way, "the consultation procedure allows FWS to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction or adverse modification of its critical habitat and, if so, to identify reasonable and prudent alternatives which will avoid the action's unfavorable impacts." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1504 (citing 16 U.S.C. § 1536(b)(3)(A)).

10. Major fish kills have been reported or suspected as having occurred in 20 of the 70 years of operation of Coolidge Dam, so the BA is not wholly hypothetical. It is based on past experience.

### c. Bald Eagle

It is undisputed that at least three breeding pairs of Bald Eagles nest at the Lake, two other pairs of Bald Eagles nest near the Lake: one is approximately 18 air-miles north and east of the dam up the San Carlos River at Talkalai Lake, and the other is approximately 10 air-miles downstream from the dam along the Gila River at Granite Basin. The Lake is the summer home for approximately 50 Bald Eagles that winter in Arizona. For purposes of the section 9 analysis, it is assumed that all of these eagles rely upon the Lake as their primary or significant source of food,[11] and the three breeding pairs of eagles at the Lake use its habitat for nesting and rearing their young.

The parties dispute whether or not the draining of the Lake during the summer months to provide irrigation water downstream has "low" potential to adversely affect the Bald Eagle or has a "strong" potential to take the Bald Eagle. Defendants assert that it is low and that there is no evidence to support the Plaintiffs' assertion that the ongoing operations of the Lake, including it being drained in the Summer, has resulted or will result in a section 9 taking of the Bald Eagle.

Plaintiffs' taking claim is premised on two theories: 1) draining the Lake has the strong potential to harm the nesting and breeding habitats of the eagles by reducing the eagles' food supply, and 2) draining the Lake will result in a major fish kill and large numbers of rotting fish pose a threat to the Bald Eagle by exposing them to avian botulism. The 1998–BA analyzed both of these possibilities.

It explained that draining the Lake increases the food supply in the short term because fish trapped in shallow water are easy prey for the eagles. In the long run, however, a catastrophic fish kill would decrease prey availability. The BA concluded that it is **unlikely** that a decreased forage base would result in starvation because eagles are wide-ranging and opportunistic foragers. (19 Exhibits, Ex. 17: BA at 19.) The eagles might temporarily abandon nesting sites but they "typically show great fidelity to nesting sites and it is **probably unlikely** that they would permanently abandon lakeside territories following a temporary loss of fish." *Id.* "Temporary loss of fish would likely eliminate or at least greatly reduce the number of eagles that winter at San Carlos Reservoir," but it is **highly unlikely** that any displaced eagle would be directly affected by the displacement although such eagles might be subject to increased indirect impacts, such as starvation or illegal shooting. *Id.* It is important to note, as the BA did, that low lake levels occur in the Summer months and eagles nest in the months of December through June and the nestling period is February through May, so the BA concluded that starvation of nestling eagles was **unlikely.** *Id.*

"Though it appears **unlikely** that any adult eagles would starve because of a fish kill, eagles might be subject to botulism poisoning under certain conditions." *Id.* Botulism is a form of food poisoning that results when *C. botulinum* spores ingested by vertebrates or invertebrates germinate when their host dies. Flesh-fly and blow fly maggots concentrate the toxin, and feeding by waterfowl or other birds on thee maggots causes death and accelerates the cycle as more and more contaminated hosts die. *Id.* at 22. Environmental con-

---

**11.** According to the Federal Defendants' Expert, Richar Glinski, who has extensive experience with and was responsible for developing Arizona's nest-search and nest-watch program, the Bald Eagles at Talkalai and Granite Basin do not use the Lake for foraging or any portion of the nesting cycle. (Federal Defendants' Exhibits, Ex. 7: Glinski Report at 7.)

ditions that promote outbreaks of avian botulism are high air temperatures, fluctuating water levels, and a suitable medium for bacterial growth, such as vertebrate and invertebrate carcasses. *Id.* "There are records of bald eagles dying as a result of botulism poisoning, although they are relatively few and it appears that most birds of prey are fairly resistant to the toxin. *Id.* Relatively low occurrence of avian botulism in eagles may be the result of the importance of carrion in their diet." *Id.* The BA concluded that while there is some potential for eagles to be affected by botulism poisoning, **"the probability of it appears to be low."** *Id.*

The BA reported that an analogous situation may have existed along the Salt River below Stewart Mountain Dam, near the Blue Point Bald Eagle breeding area. (19 Exhibits, Ex. 17: BA at 18.) Eagles have nested there since 1981. *Id.* Water releases were low between 1986 and 1989 and stopped altogether from January to March 1989 and during most of 1990. *Id.* Large fish kills were recorded during this period, and the Blue Point nest fledged three eaglets in both 1987 and 1988, but in 1989 even isolated pools in the Salt River began drying up and nesting at Blue Point failed. *Id.* Death of the two nestlings in 1989 may also, however, have been partly attributable to human disturbance. *Id.* No nesting occurred in 1990, but the nest successfully fledged two young from 1991 to 1996. *Id.*

According to the BA, if a major fish kill occurred at San Carlos Reservoir, it would take one to two years to re-establish the forage base, assuming sufficient water was present subsequent to the year of the fish kill. (19 Exhibits, Ex. 17: BA at 19.)

In response to the Defendants' motions for summary judgment, Plaintiffs submit the following evidence: 1) Drought Impact Report of 1998; 2) Ohmart Expert Report of March 22, 2002; 3) Arizona Game and Fish Department, Driscoll Memo of May 17, 1999; 4) San Carlos Apache Tribe Recreation and Wildlife Department, Moors Affidavit; 5) Game and Fish Memo of June 30, 1997.

The Drought Impact Report of 1998 was prepared to assess the "profound impacts on economies and ecosystems" of the San Carlos Reservoir caused by the frequent periods of drought in the Southwest. (Plaintiffs' Exhibits: Ex. 2: Drought Impact Report at (ix).) "Topics beyond the scope of this study included detailed analysis of hydrology, climate predication modeling, endangered species, water rights issues, and economic impact to agribusinesses in the Safford and Salt River Valleys." *Id.* Nevertheless, the Report included a short section on Endangered Species that covered the impact to the Bald Eagle "from the loss of San Carlos Reservoir." *Id.* at 24. Plaintiffs quote the following: "agency biologists anticipate that the loss of the San Carlos Reservoir would have a high probability of leading to reduced or no productivity [from the two Bald Eagle breeding areas] until the Reservoir and a suitable forage base can be reestablished." *Id.* The Plaintiffs omit the next sentence in the Report, "In all likelihood, the [eaglets from the breading areas] should be able to forage and migrate without any negative effects from reduced reservoir levels." *Id.*

The assertion in the Ohmart expert report that "any reduction or temporary absence of food can cause starvation of the young or nest abandonment of the nests by adults," (Plaintiffs' Exhibits: Ex. 12, Ohmart Report at 4), is highly suspect. He asserts that "[t]he periods of water releases for irrigation coincides with the time period that eaglets are in the nest." *Id.* at 5. This is contrary to all other evidence in the record, including the San Carlos Bald Eagle Nest Watch Report

upon which Mr. Ohmart relies, that identifies February to May as the hatching period to actual fledging. (Plaintiffs' Exhibits: Ex. 12, Nest Watch Report at 3.)

The Affidavit of Amanda Moors, Wildlife Population Biologist with the San Carlos Apache Tribe Recreation and Wildlife Department was prepared in 1999, the year Plaintiffs' filed this action. (Plaintiffs' Exhibits: Ex. 16.) She reports that the two Bald Eagle nests at San Carlos Lake were very productive in the several years prior to 1999. *Id.* at ¶ 6. She notes that fledgling Eagles coming from these two nests represent approximately 1/6 of all the fledglings in the state. *Id.* Her opinion regarding the effects of a severe drawdown or loss of all the water in the Lake is couched in terms of "may," such as: "avian botulism may occur if the drawdown is in the warmer months" and Eagles would have problems getting enough food and would be forced to move to another area for food and this movement "may lead to the abandonment of the nesting areas on the Reservation." *Id.* at ¶¶ 10, 11.

The June 30, 1997 Game and Fish memo reported that the Reservoir level is expected to reach the low level of 40,000 acre feet by late August or early September. (Plaintiffs' Exhibits): Ex. 17: Memo at 2. It reported that the Lake had dropped to 34,000 acre-feet of water in 1997 without a catastrophic fish kill. *Id.* The memo noted that there are two pair of Bald Eagles nesting at the Lake and that a major fish kill could pose a concern for their reproduction productivity. *Id.* at 3. The memo noted that at Alamo Lake and Lake Pleasant drawdowns were halted or restricted to ensure survival of the eagle's forage base. *Id.*

Last, Plaintiffs submit the Arizona Game and Fish Department's inter-office memo by Jamey Driscoll, Acting Birds Program Manager, of May 17, 1999. (Plaintiffs' Exhibits: Ex. 19.) In 1999, the drawdown of the Lake made a major fish kill imminent, and Driscoll specifically addressed what the effect would be on the Bald Eagles at San Carlos Lake. *Id.* at 1. He noted that eagles wintered at the Lake and that there were two pairs of eagles at the Reservoir and one pair that nested below the Lake. *Id.* at 1–2. In his opinion, it was a stretch to project any impact on eagles that wintered at the Lake. *Id.* at 2. He concluded that there would be no immediate direct impact on the eagles near and around the Lake because none were actively breeding, but that effects might be observed in years to come. *Id.* at 2. He explained the extent of the impact depended on when the drawdown occurs, how long the Reservoir remains low, disease related to decaying fish, and how fast the fish population recovers. *Id.* He pointed out that keeping the water in the Reservoir would have a negative effect on the pair of Bald Eagles nesting downstream because they depended on the water in the Gila River for their food supply. *Id.* He concluded, "[i]f water is drained from the reservoir, we are looking at least one year's worth of productivity at two sites, and lower winter concentrations." *Id.* at 3.

Driscoll also reported that his research had "not found proof that botulism will affect Bald Eagles," but he believed it would be "narrow minded" to say that "it will not and could not happen to Bald Eagles." *Id.* "There are no known cases of bald eagles being affected in Arizona." *Id.* In the large-scale fish kill along the lower Salt River from 1986 to 1990, there is no mention of avian botulism. *Id.* Based on the low occurrence of cases nationwide and the lack of any known occurrences in the western United States, the probability that Bald Eagles nesting or wintering at San Carlos Lake would be affected by botulism appears to be low. *Id; see also* Federal Defendants' Exhibits, Ex. 7: Glin-

ski Report (reporting that two experts with 30 years experience treating injured and diseased raptors, one expert working for in Arizona since 1973, have never encountered botulism in Bald Eagles and both stated that Bald Eagles would not likely be impacted by this disease).

 The BA and the Plaintiffs' evidence, except for the expert report by Ohmart, were all prepared within the context of Section 7 of the ESA. This is important because the Section 7 analysis in the BA assesses whether draining the Lake is likely or "not likely to adversely affect" the Bald Eagle, as compared to the Section 9 analysis that determines whether the drawdown of the Lake will actually kill or injure the Bald Eagle. Where habitat degradation merely retards recovery of a species, plaintiff must "show significant impairment of the species' breeding or feeding habitats and prove that the habitat degradation prevents, or possibly retards, recovery of the species." *Arizona Cattle Growers' Assoc.*, 273 F.3d at 1238 (*quoting Nat. Wildlife Federation v. Burlington Northern Railroad*, 23 F.3d 1508, 1513 (9th Cir.1994)). For habitat modification to constitute "harm" under ESA, the evidence must show "a reasonably certain threat of imminent harm to a protected species," not potential injury which denotes only an injury that may or may not occur. *Rosboro Lumber Co.* 50 F.3d at 784–86.

Consequently, concerns discussed within the context of section 7's requirement that an agency consider any actions that may affect a species, may not even meet the definition of a "potential" harm under section 9. The Government's expert, Richard L. Glinski's opinion is especially helpful because it is made within the context of an unlawful taking under section 9. It is his opinion that "there is no relationship between reservoir levels and Bald Eagle recruitment, and fluctuating reservoir levels do not result in the take of Bald Eagles, and do not present a reasonably certain threat of imminent harm to the species." (Federal Defendants' Exhibits: Glinski Report of 2002 at 7.)

He studied the relationship between water levels as the Lake and eagle productivity from 1993 to 2001, a period of generally declining reservoir levels in response to a regional drought. *Id.* at 8. He studied three breeding areas (BA): Collidge BA, located downstream from the dam; San Carlos BA, located on the northern boarder of the Lake at its confluence with the San Carlos River; and the Suicide BA, located about one-half mile up-lake from the dam. The Suicide BA is the most recently established BA. In Glinski's opinion, it was the appearance of the Suicide BA in 1999 that lowed the productivity of the other two resident pairs of Bald Eagles. According to Glinski, the "presence of 'additional' birds near territorial birds, or birds that attempt to nest near occupied BAs, often lowers productivity of the resident pair. (Newton 1979)" at 6. "This density dependence is typical of expanding raptor populations (Newton 1979)." *id.*

Glinski writes that the increase in eagle BAs at the Lake during the period analyzed is significant because with the advent of the Suicide site in 1999, the productivity of the other two BAs would be expected to decline. *Id.* at 9. He explains that the location of the Suicide BA places it in the most competitive foraging location, capable of cutting the Coolidge pair of Bald Eagles off from foraging near the dam, which is likely where they confined their hunting after the San Carlos BA became established. *Id.* In looking at the Suicide BA from 1999 to 2001, this site has maintained high eagle productivity, fledging 7 young in three years, with Lake levels fluctuating from about 300,000 to about 26,000 acre-feet of water. *Id.* He finds it doubtful that

the Coolidge BA could be able to exist if water from the Lake were not allowed to flow into the Gila River. *Id.*

In conclusion, Glinski asserts that San Carlos Lake mimics the situations of other reservoirs in Arizona relative to Bald Eagle nesting. "[T]he major trend in Bald Eagle nesting population in Arizona is that more nests are producing more total young, but each nest is contributing fewer young to the growing population." *Id.* at 12. "The increased population of eagles has the effect of diminishing individual BA productivity." *Id.* Productivity is related to density, not reservoir level. *Id.* at 13. The fluctuating reservoir levels do not result in the take of Bald Eagles and there is no threat of imminent harm to the species from the ongoing operation of the dam.

■■■■ The Court considers the presentation of evidence here on summary judgment and, therefore, it is not proper to weigh the persuasiveness or credibility of one expert as compared to the other, but only to determine whether there is a genuine issue for trial. Construing the evidence in the most favorable light for the Plaintiffs, the evidence at best suggests some potential for harm, and much of the evidence relied on by the Plaintiffs is simply that there may be some potential harm. Neither showing is sufficient to raise a material issue of fact regarding the claim that drawdown of the Lake below 100,000 acre-feet of water will constitute a taking of the Bald Eagle in violation of section 9 of the ESA.

### d. Southwest Willow Flycatcher and Razorback Sucker

While Plaintiffs failed to present evidence sufficient to raise a material issue of fact as to the Bald Eagle, there is not even a scintilla of evidence that the Federal Defendants' operation of the Lake will even affect the Southwest Willow Flycatcher and Razorback Sucker. There is

no evidence to support the Plaintiffs' section 9 claim that Lake operations will result in a taking of the Southwest Willow Flycatcher and/or Razorback Sucker.

■■■■ The Razorback Sucker is a native fish species that completely disappeared from the Gila River by 1960. Reintroduction of the fish was attempted between 1981 and 1989, but was a failure. The restocking of the Gila River was made in the vicinity of Thatcher, Arizona and approximately 1,100,000 fingerlings (less than 130 mm in total length) and a few (fewer than 25) large (greater than 500 mm) razorback suckers were placed in the river. (BA at 14.) Within a few days of stocking "a very high number of reintroduced razorbacks were eaten by channel and flathead catfish." (BA at 15.) Any Razorback Sucker in the Lake would be a survivor or offspring of this reintroduction. From Thatcher to the Lake is a 50 mile swim downstream. (BA at 15.) If they survived the predation by the mostly exotic fish species in the Gila River, they would have reached the Lake and then would have had to survive the 1976 and 1977 drawdowns of the Lake that resulted in massive fish kills. (BA at 15.)

No Razorback Suckers were found among the approximately 1,664 fish captured during depletion surveys conducted in 1996 at the Eagle Creek diversion dam, nor among a sample of 2,529 fish from six locations along the Gila River and San Simon River in the Safford area in May 1997. (Federal Defendants' Exhibits, Ex. 3: Leibfried Expert Report at 2; Ex. F: BA at 15.) It is undisputed, that there has never been a Razorback Sucker found in the Lake. The number one reason that there are no Razorback Suckers in the Lake is because of the high level of predation of the sucker by exotic species, especially flathead catfish and large-mouth bass that Plaintiffs' stock in the San Carlos

Reservoir. (Federal Defendants' Ex.· 3: Leibfried Expert Report at 2.)

 The Southwest Willow Flycatcher is a migratory bird that occupies breeding range in Arizona during the months of May through August. It inhabits riparian areas along the Gila River, especially downstream between the confluence of the San Pedro River and Ashurst–Hayden Dam. (*See* 19 Exhibits, Ex. F: BA at 16 (approximately 30 pairs and 35 or 36 territories and 27 nests)). The Plaintiffs' own Expert Report provides the following evidence to defeat Plaintiffs' section 9 claim. Flycatchers nest in May, June and July at three principal locations at or near the Reservoir: 1) upper San Carlos River (above the Southern Pacific Railroad bridge); 2) lower San Carlos River (below the Southern Pacific Railroad bridge), and 3) the Gila River (near Calva). (Plaintiffs' Exhibits, Sealed Supplement of June 21, 2002, Report at 2.) Areas 1 and 3 are substantially outside the maximum pool elevation of the Reservoir (877,000 acre-feet of water or above 2511.5 feet elevation) and "therefore are not directly influenced by its operation." *Id.* At least 16 flycatchers representing eight confirmed nesting pairs were reported to have been detected at the Lower San Carlos River Breeding Area [Area 2] in June of 1998. *Id.* The habitat where they nested was at or above 2,500 feet elevation or at the approximately 877,000 acre-feet water level of the Lake. *Id.* Plaintiffs' expert reports that in 11 out of 71 years the Lake has reached its maximum pool elevation and, when this happens it has a positive influence on this breeding area. *Id.* 2–3. However, if the water rises to 877,000 acre-feet it reaches the spillway level and then it may inundate and destroy flycatcher nests. *Id.* at 3, 4. According to Plaintiffs' expert, if the Lake is kept at 75,000 acre-feet, which is the recommendation of the Plaintiffs,[12] flycatcher habitat at this corresponding elevation (2,430 feet) is over 4 miles away. *Id.* Consequently, due to the distance between the Lake and flycatcher habitat, operation of the Lake at this level "would be unlikely to impact or influence flycatchers." *Id.*

Plaintiffs' fail to present even a scintilla of evidence to support its section 9 claim that the Federal Defendants' operation of the San Carlos Reservoir will result in a taking of the Razorback Sucker or the Southwestern Willow Flycatcher. Plaintiffs' ESA claim fails.

## Federal Common Law Claim of Nuisance

Plaintiffs allege that the drawdowns and draining of the Lake by the Defendants threaten injury and pose health risks to the public at large and to the Apache Tribe and its members. Plaintiffs allege that these threats constitute a public and private nuisance. Plaintiffs seek injunctive relief in the form of an Order from this Court that Defendants abate this nuisance.

Section 1331 of Title 28 provides that "the district courts shall have original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States." Section 1362 also provides subject matter jurisdiction over this case because "the district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band …, wherein the matter arises under the Constitution, laws or treaties of the United States."

---

12. The Court notes that operating the Reservoir at 75,000 acre-feet of water, with the exception of the release of 10 c.f.s. per day, in May through July would be the only scenario that might result in a take of the Southwestern Willow Flycatcher because it would dry up the riparian flycatcher habitat along the Gila River downstream of the Coolidge Dam. (Federal Defendants' Exhibits, Ex. 8: Brown's Expert Report at 5.)

■ Jurisdiction exists over violations to the federal common law as well as those of statutory origin, *Illinois v. City of Milwaukee,* 406 U.S. 91, 100, 92 S.Ct. 1385, 31 L.Ed.2d 712 (1972), and, therefore, this Court has subject matter jurisdiction over Plaintiffs' common law nuisance claim.

■ Under the doctrine of sovereign immunity, the United States is, however, immune from suit except when Congress has waived the Government's immunity. *Tucson Airport Authority v. General Dynamics Corp.,* 136 F.3d 641, 644 (9th Cir.1998). Neither 28 U.S.C. § 1331 nor § 1362 waives sovereign immunity. *See Pit River Home and Agri. Co-op. Ass'n v. United States,* 30 F.3d 1088, 1098 n. 5 (9th Cir.1994) (explaining that sections 1331 and 1361 do not waive the sovereign immunity of the United States) (*citing Holloman v. Watt,* 708 F.2d 1399, 1401 (9th Cir.1983) § 1331 not a waiver), *cert. denied,* 466 U.S. 958, 104 S.Ct. 2168, 80 L.Ed.2d 552 (1984); *Smith v. Grimm,* 534 F.2d 1346, 1352 n. 9 (9th Cir.) § 1361 not a waiver, *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *see also Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Montana Board of Oil and Gas,* 792 F.2d 782 (9th Cir.1986) (noting that section 1362 does not waive sovereign immunity).

Congress waived immunity for suits against the United States for money damages under the Tucker Act and the Federal Tort Claims Act (FTCA). Contract claims are brought under the Tucker Act. The FTCA is the exclusive remedy for torts committed by Government employees in the scope of their employment. *United States v. Smith,* 499 U.S. 160, 163, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). Defendants argue that the FTCA is the only avenue of relief available to the Plaintiffs and that Plaintiffs failed to give notice of their claim to the agency as required by the FTCA. Consequently, Plaintiffs may not proceed under the FTCA. Defendants argument fails, however, because Plaintiffs do not seek monetary damages.

■ Plaintiffs seeking non-monetary relief in the form of judicial review of an action by a federal agency may proceed under the Administrative Procedures Act (APA). 14A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3659 (3d ed.1998). In 1976, Congress amended the APA to specifically waive sovereign immunity in suits brought against the United States seeking relief "other than money damages."

The APA provides as follows:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702.

■ The APA does not provide an independent basis for jurisdiction, *Assiniboine,* 792 F.2d at 793 (citing *Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)), but it waives sovereign immunity in non-monetary relief claims brought under federal question statutes 28 U.S.C. §§ 1331 and 1362. *Id.* The APA also provides the frame work for review of Plaintiffs' nuisance claim. 2 Fed. Proc. Law Ed., § 2:266 (APA pro-

vides framework for judicial review of agency actions once jurisdiction is otherwise established) (*citing Gallo Cattle Co. v. United States Dept. of Agriculture,* 159 F.3d 1194 (9th Cir.1998)).

The initial difficulty this Court faces in analyzing its jurisdiction over Plaintiffs' nuisance claim is that Plaintiffs have wholly ignored the APA. They failed to plead the APA as a jurisdictional basis for their claims in the Complaint and refuse to recognize its significance even in the responsive brief to the motions for summary judgment. Consequently, Plaintiffs have failed to identify for the Court the requisites in their claim necessary for proceeding under the APA.

Section 702 of the APA includes important exceptions to administrative review. Section 702 states: "Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."[13] Section 704 adds: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Judicial review is not available when the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

■ Additionally, when review is **not** sought pursuant to specific authorization in a substantive statute, but only under the general review provisions of the APA, 5 U.S.C. § 702, Plaintiffs must satisfy two requirements: 1) they must show that they have been affected by some "agency action" as defined in section 551(13), 5 U.S.C. § 701(b)(2), and the "agency action" must be a "final agency action" pursuant to section 704; 2) they must prove that they have suffered a "legal wrong" or are "adversely affected or aggrieved" by that action "within the meaning of a relevant statute," which requires a showing that the injury complained of falls within the "zone of interests" sought to be protected by the relevant statute. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 882–883, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

■ As to the second factor, the injury the Plaintiffs complain of must fall within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis of the complaint. *Id.* As to the first factor, "agency action" for purposes of § 702 is defined in 5 U.S.C. § 551(13), 5 U.S.C. 701(b)(2), as follows: "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* at 882, 110 S.Ct. 3177.

■ Plaintiffs allege that the ongoing operation of the dam, which includes sometimes releasing water so that the Lake is drawn down to a point that allegedly results in a public nuisance, is not the type of agency action covered by the APA. In *Lujan,* the Supreme Court held that the land withdrawal review program operated

---

**13.** Defendants seek dismissal of the nuisance claim under this exception because they argue that the FTCA provides an adequate remedy in a court and impliedly forbids the relief sought here. Defendants rely on a statement in *United States v. Smith,* 499 U.S. at 163, 111 S.Ct. 1180, that the FTCA is the exclusive remedy for a tort claim against the government, but *Smith* only involved a claim for monetary damages. There are Tucker Act cases, *see North Star Alaska v. United States,* 14 F.3d 36, 38 (9th Cir.1994), which by analo-gy might provide a basis for holding here that the FTCA provides the exclusive remedy for an equitable tort claim. It is unnecessary to rely on this exception to the APA's waiver of immunity, however, because the APA does not apply to Plaintiff's nuisance claim. *See supra; see also Committee of Blind Vendors v. District of Columbia,* 28 F.3d 130, 134 (D.D.C.1994) (*en banc* ) (explaining that APA does not apply to common law claim of mis-administration against an agency).

by the Bureau of Land Management (BLM) was not agency action, much less final agency action, because the complaint did not refer to a single BLM order or regulation, or even to a completed universe of BLM orders and regulations, but rather referred to continuing and constantly changing BLM operations of reviewing withdrawal revocation applications and its classifications of public lands and its general responsibilities of developing land use plans. *Id.* at 890, 110 S.Ct. 3177.

The Court reasoned that the APA did not lay before the courts the wholesale correction of agency programs, *id.* at 893, 110 S.Ct. 3177, but "only provides for intervention in the administration of the laws when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect," *id.* at 894, 110 S.Ct. 3177 (*citing Toilet Goods Assn. v. Gardner,* 387 U.S. 158, 164–166, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967)).

 The day to day operation of the dam is not a final agency action reviewable under the APA. Agency action is "final" and reviewable if a minimum of two conditions are met: 1) the action marks the consummation of the agency's decision-making process ... it must not be of a merely tentative or interlocutory nature, and 2) it must be one by which rights or obligations have been determined, or from which legal consequences will flow. *Nippon Miniature Bearing Corp. v. Weise,* 230 F.3d 1131, 1137 (9th Cir.2000) (*citing Bennett,* 520 U.S. at 177, 117 S.Ct. 1154; *see e.g., Gallo Cattle Company v. United States Department of Agriculture,* 159 F.3d 1194 (1998) (explaining that decision to not allow Gallo to pay its assessments into escrow accounts is not final agency action because obligation to pay assessments arises pursuant to the Dairy Promotion Program not from the agency's decision); *FTC v. Standard Oil Co.,* 449 U.S. 232, 241, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980) (noting that the action must be a definitive statement of the agency's position with concrete legal consequences); *Ecology Center, Inc. v. United States Forest Service,* 192 F.3d 922, 925 (9th Cir.199) (explaining that failure to monitor as required by Kootenai National Forest Plan is not final agency action because monitoring is not an action that marks the culmination of a decision making process).

Plaintiffs do not explain how sometimes allowing the Lake to drop to the alleged harmful levels or even draining it marks the culmination of a decision making process by the Federal Defendants, nor are there any legal rights or obligations determined by the practice. *See, Ecology Center, Inc.,* 192 F.3d at 925 (monitoring duty is mandatory under the Plan, but legal consequences do not necessarily flow from that duty, nor do rights or obligations arise from it). The challenged drawdowns merely reflect the rights and obligations of the respective parties to the waters in the Reservoir, as established by the San Carlos Project Act, the Globe Equity Agreement, and the San Carlos Apache Tribe Water Rights Settlement Act of 1992. Consequently, Plaintiffs' nuisance claim is not reviewable under the APA and must be dismissed.[14]

14. Because Plaintiffs' claim fails under the first prong of the analysis, the Court need not reach the second factor of whether the injury the Plaintiffs complain of falls within the zone of interests sought to be protected by the legal basis of the complaint. Intervenor GRIC has argued that Plaintiffs themselves create the public nuisance because they are the entity placing the fish in the Reservoir. GRIC argues that the common law doctrine of nuisance does not allow someone who dumps garbage on a neighbor's property to sue the neighbor. Under GRIC's analogy, Plaintiffs would not be within the zone of interests protected by the common law doctrine of nuisance.

### NEPA and NHPA Claims

▮ Plaintiffs do not seek jurisdiction under the APA for their National Environmental Protection Act (NEPA), Fish and Wildlife Coordination Act (FWCA) and National Historic Preservation Act (NHPA) claims. There is, however, no private right of action under NEPA. *See Oregon Natural Res. Council Action (ONRC) v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir.1998) (*citing Lujan*, 497 U.S. at 882, 110 S.Ct. 3177); *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1114 n. 14 (9th Cir.2002). There is no private right of action under the FWCA. *See Utah Council, Trout Unlimited v. United States Army Corp. of Engineers*, 187 F.Supp.2d 1334, 1351 (Utah. 2002) (it is well settled that the FWCA provides no private right of action for citizen suits) (*citing see, e.g., Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 268 (5th Cir.1984); *Environmental Defense Fund, Inc. v. Andrus*, 596 F.2d 848, 853 (9th Cir.1979); *Environmental Defense Fund, Inc. v. Froehlke*, 473 F.2d 346, 356 (8th Cir.1972)); *see also Environmental Defense Fund, Inc. v. Alexander*, 501 F.Supp. 742, 767 (Miss.1980) (FWCA claim is merged with and subsumed by NEPA claim).

▮ There is no private right of action under the NHPA. *See e.g., Presidio Golf Club v. National Park Service*, 155 F.3d 1153, 1158 (9th Cir.1998) (exercising jurisdiction over NHPA claim pursuant to the APA). *Presidio* has been mis-cited as holding that there is a private right of action under the NHPA, *see Yankton Sioux Tribe v. United States Army Corps of Engineers*, 194 F.Supp.2d 977, 990 (S.Dak.2002), but it does not. In *Presidio* the court found standing under the APA for plaintiff's NHPA complaint. Other cases in the Ninth Circuit involving NHPA violations also rely on the APA for jurisdiction: *Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir.2000) (complaint alleged NEPA, NHPA and APA violations); *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569 (9th Cir.1998) (applying discretionary APA standard of review); *Tyler v. Cisneros*, 136 F.3d 603, 605 (9th Cir.1998) (finding subject matter jurisdiction over NHPA claim under the APA).[15]

▮ As already noted, Plaintiffs' First Amended Complaint does not include a claim under the APA nor any assertion of jurisdiction under the APA.[16] Defendants, accordingly, seek dismissal of Plaintiffs NEPA, FWCA, and NHPA claims. Plaintiffs do not respond to the Defen-

---

**15.** Relying on *Boarhead Corporation v. Erickson*, 923 F.2d 1011, 1016–1017 (3rd Cir.1991) and its progeny, Plaintiff contends that there is a private right of action under the NHPA. *But see Boarhead*, 923 F.2d at 1017 n. 11 (noting that 28 U.S.C. § 1331 alone does not authorize an action against the Government and explaining that the United States' sovereign immunity is waived under the APA). *See also National Trust for Historic Preservation v. Blanck*, 938 F.Supp. 908, 914 (D.D.C.1996) (relying on *NAACP v. Secretary of Housing and Urban Devel.*, 817 F.2d 149 (1st Cir.1987)) (explaining that the omnipresent availability of APA review over government agency actions makes it unnecessary for Congress to create private rights of action against the federal government).

**16.** The standard of review in an APA case is highly deferential. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 n. 23, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989); *Morongo Band of Mission Indians v. Federal Aviation Admin.*, 161 F.3d 569, 573 (9th Cir.1998) (applying APA in NHPA case); A court may invalidate a final agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The party bringing an APA case bears the burden of demonstrating that the agency's actions were arbitrary and capricious. *Committee to Preserve Boomer Lake v. Department of Transp.*, 4 F.3d 1543, 1555 (10th Cir.1993); *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir.1995).

dants' argument that jurisdiction over these claims exists only under the APA and that the jurisdictional requirements of the APA are not satisfied. For example, Plaintiffs fail to identify the final agency action that is reviewable under the APA, relevant to the alleged statutory violations. As already noted, the ongoing day-to-day operation of the Lake, including draining it to below 75,000 acre-feet of water, is not a final agency action for purposes of APA review.

■ Because Plaintiffs fail to recognize the applicability of the APA, they simply argue the substantive merits of their NHPA, NEPA and FWCA, claims. There is, however, no jurisdiction to reach the merits of these claims. It is well established that "once a court is divested of jurisdiction over a claim, its analysis is ended, and it should not proceed with any further analysis of the merits of the claim." *See* (Order filed January 28, 2002 (granting Defendants' Motion to Reconsider this Court's dismissal of Plaintiffs' § 7 claim on the merits because the claim was subject to dismissal on the basis of inadequate notice; amending Order of November 19, 2001 to delete the portion of the Order addressing the merits of Plaintiffs' § 7 failure to consult claim) (*relying on: Rivera v. Railroad Retirement Bd.*, 262 F.3d 1005, 1014 (2001) (dismissing appeal of dismissal of application for benefits for lack of jurisdiction without reaching the merits of boards' decision); *Environmental Protection Information Ctr. v. Pacific Lumber*, 257 F.3d 1071, 1077 (9th Cir.2001) (vacating district court order based on the merits after the district court lost jurisdiction over the case); *Axess Int'l Ltd. v. Intercargo Insur. Co.*, 183 F.3d 935, 943–44 (9th Cir.1999) (vacating portion of district court order adjudication the merits after it declined to exercise supplemental jurisdiction)). Because there is no jurisdictional basis for Plaintiffs' NHPA, NEPA and FWCA, they are dismissed.

*NAGPRA and ARPA Claims*

Plaintiffs assert that the wave action of the Lake as the water recedes and the exposure to vandals of the Native American cultural items and human remains that lie at the bottom of the Lake result in their destruction and damage. Plaintiffs allege that the Defendants' operation of SCIIP causes damage and desecration to Apache graves, historic and sacred sites, funerary objects, sacred objects, and objects of cultural patrimony in violation of the Native American Graves Protection and Repatriation Act (NAGPRA) and the Archeological Resource Protection Act (ARPA).

■ There is a private right of action under NAGPRA, pursuant to the following statutory language:

> The United States district courts shall have jurisdiction over any action brought by any person alleging a violation of this chapter and shall have the authority to issue such orders as may be necessary to enforce the provisions of this chapter.

25 U.S.C. § 3013. *See Pueblo of San Ildefonso v. Ridlon*, 103 F.3d 936, 939 (10th Cir.1996) (jurisdiction for suit provided by statute); *see Bonnichsen v. United States Dept. of the Army*, 969 F.Supp. 614, 627 (D.Or.1997) (explaining that this language is a clear expression of Congress' intent to establish a right to declaratory and injunctive relief to redress violations of NAGPRA). The APA waives the sovereign immunity of the Government for NAGPRA claims. *Bonnichsen*, 969 F.Supp. at 627, n. 17. Accordingly, this Court has jurisdiction to consider the merits of Plaintiffs' NAGPRA claim.

"The NAGPRA represents the culmination of 'decades of struggle by Native American tribal governments and people to protect against grave desecration, to [effect the repatriation of] thousands of dead relatives or ancestors, and to retrieve

stolen or improperly acquired cultural property.'" *Yankton Sioux Tribe v. United States Army Corps of Engineers,* 83 F.Supp.2d 1047, 1055 (D.S.D.2000) (*citing* Jack F. Trope and Walter R. Echo–Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History,* 24 Ariz.L.J. 35, 36 (1992)).

The NAGPRA applies to the human remains of Native American peoples,[17] to funerary objects, and to sacred and cultural patrimony objects. 42 C.F.R. § 10.1(b). Funerary objects are things associated with Native American burials. 42 C.F.R. § 10.2(d)(2). Sacred objects are specific ceremonial objects needed for the practice of traditional Native American religions, and are exclusively limited to objects used in religious ceremonies or rituals. 42 C.F.R. § 10.2(d)(3). Objects of cultural patrimony are items that have ongoing historical, traditional, or cultural importance central to the tribe rather than property owned individually. 42 C.F.R. § 10.2(d)(4). Objects of cultural patrimony are of such central importance that they may not be alienated, appropriated, or conveyed by any individual tribal or organization member. *Id.*

In addition to repatriation requirements,[18] the NAGPRA provides for the protection of Native American cultural items, including human remains, which are excavated or discovered on federal or tribal lands after November 16, 1990.

The Act governs the intentional excavation or removal of Native American human remains and objects from federal or tribal lands and does not allow excavation or removal unless items are removed or excavated pursuant to a permit issued under the Archeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa–470mm. 25 U.S.C. § 3002(c)(1). It also prohibits the intentional removal of Native American cultural items from federal lands prior to consultation with or, in the case of tribal lands, without the consent of, the appropriate Indian tribe, and proof of such consultation or consent. 25 U.S.C. § 3002(c)(2), (4). Section 3002(a) of the NAGPRA governs the ownership and control of Native American cultural items which are intentionally excavated or removed.

The Act also governs the inadvertent discovery of Native American cultural items on federal or tribal lands. In pertinent part, the Act provides:

> Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the [Interior], or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal

---

**17.** The Act protects the cultural items of both Indian tribes and Native Hawaiian organizations under the rubric of "Native American" cultural items, but references to Native Hawaiian organizations are not relevant here.

**18.** The Act establishes detailed criteria and procedures for determining the "ownership and control" of human remains and cultural items. The ownership or control of Native American human remains and associated funerary objects rests with the lineal descendants of the Native American who has left the remains or funerary objects, 25 U.S.C.

§ 3002(a)(1). If the lineal descendants cannot be ascertained, or in cases involving unassociated funerary objects, sacred objects, and objects of cultural patrimony, the Act develops a scheme for determining which tribe has the closest relationship, and hence the strongest entitlement, to the items, based on geographic and cultural factors. *See* 25 U.S.C. § 3002(a)(2). The regulations require federal agency officials to determine who is entitled to custody of the cultural items, and set forth procedures for the notification of potential lineal descendants and interested tribes, 43 C.F.R. § 10.6.

lands and the appropriate Indian tribe ... with respect to tribal lands, if known or readily ascertainable.... **If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming this activity,** and provide notice under this subsection. Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe ... that notification has been received, the activity may resume within 30 days of such certification.

25 U.S.C. § 3002(d)(1) (emphasis added). As with Native American cultural items which are intentionally excavated or discovered, such items which are inadvertently discovered are subject to the "ownership and control" provisions of § 3002(a).

Additionally, federal agency officials who receive notification that Native American cultural remains have been inadvertently discovered on federal lands must, **within three working days** from notification: (1) certify receipt of the notification; (2) take immediate steps, if necessary, to further protect the cultural items, including, as appropriate, stabilization or covering; (3) notify Indian tribes which might be entitled to ownership or control of the cultural items under the Act; (4) initiate consultation on the inadvertent discovery pursuant to 43 C.F.R. § 10.5 (governing consultation with Indian tribes); (5) follow the provisions of 43 C.F.R. § 10.3(b) (governing intentional excavation or removal) if the cultural items must be excavated or removed, and (6) ensure that the disposition of the cultural items is carried out following 43 C.F.R. § 10.6 (governing custody of Native American cultural items). 43 C.F.R. § 10.4(d)(1).

 Plaintiffs' claim that the drawdown of the Lake is an intentional excavation or removal of archaeological resources requiring an ARPA permit lacks merit. No ARPA permit is required to conduct activities on public lands when those activities are entirely for purposes other than the excavation or removal of archaeological resources. The ARPA includes a savings provision that "nothing in this chapter shall be construed to repeal, modify, or impose additional restrictions on the activities permitted under existing laws and authorities relating to mining, mineral leasing, reclamation, and other multiple uses of the public lands." 16 U.S.C. § 470kk. The regulations include the following: "No permit shall be required under this part for any person conducting activities on the public lands under other permits, leases, licenses, or entitlements for use, when those activities are exclusively for purposes other than the excavation and/or removal of archaeological resources, even though those activities might incidentally result in the disturbance of archaeological resources. General earth-moving excavation conducted under a permit or other authorization shall not be construed to mean excavation and/or removal as used in this part." 43 C.F.R. § 7.5(b)(1).

This Court finds that the ARPA does not apply to Defendants' ongoing operation of SCIIP because these activities are not intentional excavation and removal of human remains. *See Attakai v. United States,* 746 F.Supp. 1395, 1410 (Ariz.1990) (explaining that the ARPA "is clearly intended to apply specifically to purposeful excavation and removal of archeological resources, not excavations which may, or in fact inadvertently do, uncover such resources.") Defendants activities are covered by the savings clause. Plaintiffs'

ARPA claim is without merit as it has no basis in law. It must be dismissed.

Plaintiffs' allege that "Defendants have violated NAGPRA and threaten to violate it further by engaging in the activity of releasing water from the Lake in support of an agricultural activity in a Federally funded irrigation project which they know or have reason to know will result in the disturbance of hundreds of Native American grave sites at the former San Carlos Cemetery and at other burial locations within the area of the Lake. Despite such knowledge, they have failed to obtain a permit or to give notice or confer with the San Carlos Tribe; failed to prepare or present any plan of mitigation to the disturbance; and failed to provide any arrangements for security for the grave sites during the days and weeks they will lie exposed and open to vandals, pot hunters and other thieves of time." (Amended Complaint at ¶ 93.)

"NAGPRA is not prospective and is triggered only after a person has made an inadvertent discovery." (Federal Defendants' Memorandum at 37.) To survive Defendants' Motion for Summary Judgment, Plaintiffs must present some evidence to show that Defendants' ongoing operation of the Lake, specifically the drawdowns of the Lake below 75,000 acrefeet of water, have resulted in the inadvertent discovery of human remains and other items protected by NAGPRA and that Defendants have failed to comply with NAGPRA provisions for some specific inadvertent discovery.

In *Yankton Sioux Tribe,* the court temporarily enjoined the Army Corps of Engineers (the Corps) from raising the Lake Francis Case behind Fort Randall Dam because raising and lowering the water in the Lake uncovered graves containing human remains. In *Yankton,* the waters rose and fell in relation to a flood control project. The St. Phillips Cemetery, a cemetery used for the burial of tribal members dating back to the early nineteen hundreds, lay at the bottom of the Lake. The Corps was supposed to have relocated the cemetery as part of its construction of the dam, but failed to do so prior to inundating the Lake with water. Consequently, the adjustment of the water levels in the Lake as required for flood control resulted in uncovering graves. Human remains and other grave contents were spilled onto the floor of the Lake and became exposed when the Lake was drained. As well, the ongoing operation of the flood control project resulted in the discovery that the cemetery had not been relocated.

Caskets with human remains and cultural items within them remained in-bedded and in the ground, subject to being uncovered by the flood control activities of defendants. "The regulations define an inadvertent discovery as 'the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands.'" *Yankton,* 83 F.Supp.2d at 1056 (*citing* 43 C.F.R. 10.2(g)(4)). The court considered both the exposed bones and the cemetery with its still buried contents to have been inadvertently discovered as a result of the Corps flood control operation. NAGPRA applied.

The Corps was required to comply with the notice, certification, and consultation provisions of the NAGRPA regarding the discovery of the cemetery and its contents. As the discoverer of the remains, the Corps had a duty to cease its flood control activities for 30 days and "make a reasonable effort to protect" the inadvertently discovered items. As the federal agency responsible for managing the site, it must "further secure and protect the inadvertently discovered human remains, including where necessary, stabilizing and

covering.'" *Yankton*, 83 F.Supp.2d at 1057 (*relying on* 42 C.F.R. § 10.4.)

The court held that the Corps had to make a reasonable effort to protect the discovered items as best it could within the 30 day time frame before flood control activities recommenced. For example, at a minimum the Corps might gather up the bones lying exposed on the dry lake bed so that they would not be washed away when the Lake was re-flooded at the end of the 30 days. The court treated the reasonable efforts to protect the inadvertently discovered items within the 30 days prior to resumption of the flood control activities as separate and distinct from the Corps duty to secure and protect the inadvertently discovered items. The measures taken to satisfy the former would not necessarily satisfy the latter. In other words, gathering up the bones before reflooding the Lake at the end of 30 days did not satisfy the Corps obligation to secure and protect the graves that remained subject to destruction and damage from the Corps' flood control activities.

Here, Defendants assert that Plaintiffs have not established any inadvertent discovery of a cultural, sacred, funerary object or human remains to trigger coverage under NAGPRA and that until Plaintiffs can point to a specific location where someone has made an inadvertent discovery of some item covered by NAGPRA, Plaintiffs cannot viably claim that the United States has violated the statute. (Federal Defendants' Memorandum at 37–38.) Plaintiffs assert that this "blanket statement" by Defendants is another example of how they have steadfastly refused to meet the obligations of NAGPRA and have chosen to turn a blind eye to the large body of evidence presented by the Apache Tribe

demonstrating the BIA has been notified of the inadvertent discovery of Native American cultural objects and/or human remains. (Plaintiffs' Consolidated Response at 71.)

Plaintiffs rely on the following evidence: Affidavit of Regional Archeologist for the BIA, Garry J. Cantley, submitted in support of Federal Defendants' motion for summary judgment at ¶ 4 (admitting that "former Tribal Archaeologist, Chad Smith, had called him and reported that he had found what he suspected to be a fragment of human bone ..."); Letter from BOR to Chairman of the San Carlos Apache Tribe, Raymond Stanley, dated August 30, 1996, Exhibit 10 (addressing concerns raised by the Tribe "regarding the declining water level in the Lake, the exposure of cultural resources and human remains at Old San Carlos..."); Native American Affairs Budget Proposal Worksheet, 1997 Drought Appropriation Proposal (Drought Proposal) at 1, Exhibit 11 (discussing the Apache Tribe's 1997 drought declaration and observing that "[of specific concern is the exposure of traditional San Carlos cultural properties at the bottom of the reservoir ..."); Chad Smith Report, Exhibit 7 (observing that the Tribal Historic and Cultural Preservation Office had "appraised the BIA and B[OR] of their responsibilities as Federal Agencies to identify and protect or mitigate adverse effects to, cultural resources under ... Section 106 and 110 of the National Historic Preservation Act ...")

(Plaintiffs' Consolidated Response at 71–72);[19] *see also* (Plaintiffs' Exhibits, Ex. 8: Swift Testimony at 105–107) (testimony

---

**19.** Plaintiffs accuse the Defendants SCIIP of admitting in the formulation of their interim Archaeological Resource Protection Plan that there have been intermittent discoveries of

items covered by NAGPRA, but the cite they rely on, Exhibit 11 to F.Def. Brief, contains no such admission.

that she and others showed federal government people from Phoenix where different burial sites were and they saw a head with human hair floating face down in the lake, and that right in the middle of the Lake was a cemetery containing about 300 graves and another grave site of about 100, but other graves were just scattered.)

Garry J. Cantly has been the BIA Regional Archaeologist for the BIA since 1999. His declaration outlines the BIA's efforts to enlist the Plaintiffs' comments regarding development of a San Carlos Cultural Resource Management Plain to satisfy BIA obligations under the NHPA and NAGPRA. Mr. Cantly is responsible for receiving and handling reports of inadvertent discoveries of protected NAGPRA items. As noted by Plaintiffs, in Paragraph 4 of the Cantly declaration, he reports that the former Tribal Archaeologist, Chad Smith, once contacted him to report that he had found what he "suspected" to be a human bone and that, pursuant to directives from the Tribe regarding such discoveries, he had re-buried it.[20] According to Mr. Cantly, other than this one incident, no one affiliated with the Tribe has ever reported any other inadvertent discovery of human remains or other objects to trigger NAGPRA. (Federal Defendants' Exhibits, Ex. 11: Cantly Declaration dated July 10, 2002 at ¶ 4.)

■ Plaintiffs rely on a letter dated August 30, 1996 from the BOR to Raymond Stanley, Chairman of the San Carlos Apache Tribe, addressing the "Tribe's concerns regarding the declining water level in the Lake, the exposure of cultural resources and human remains at Old San Carlos, and the threat to the fishery resources in the Lake." (Plaintiffs' Exhibits, Ex. 10: Letter at 1.) First, it is important to note that cultural sites and objects protected under NHPA are not synonymous

with cultural objects protected under NAGPRA. Nothing in BOR's letter suggests that there was an actual discovery of human remains or other object protected under NAGPRA at the Old San Carlos.

Plaintiffs refer the Court to the project description section of the 1997 Drought Appropriation Proposal that included the following statement: "In 1990, this in fact happened, causing catastrophic losses to the trophy fishery and exposing the old town of San Carlos and cemeteries." (Plaintiffs' Exhibits, Ex. 11: Proposal at 1.) The Drought Appropriation Proposal explained that the Proposal was being prepared so that "the tribe could provide specific scientific data to Congress, State and Federal Agencies to seek relief and determine quantities of water to purchase from the market if economically sound to do so." Id. at 1–2.) The Proposal would include scientific data regarding adequate water levels to protect the fishery and "Environmental analysis to determine impacts to cultural properties with a mitigation plan for future management scenarios." Id. at 1. The environmental/cultural analysis was to include "history, inventory, impacts to cultural properties at varying reservoir capacities and/or elevations, mitigation plan, and law enforcement strategies." Id. at 2. The Proposal data should have supported the NAGPRA claim, but Plaintiffs fail to offer any substantiating study results.

Plaintiffs submit a report by Chad Smith, Tribal Archeologist, dated August 7, 1997, that outlined some of the known information, locations, and damages at cultural sites that were exposed in the drawdown of the San Carlos Lake in 1996. (Plaintiffs' Exhibits, Ex. 7.) He reported numerous instances of damage to cultural sites, specifically at Jackrabbit Flat. (Plaintiffs' Exhibits, Ex. 7.) He also noted

**20.** "... removal of human remains is forbidden and spiritually dangerous in the Apache culture..." (Plaintiffs' Consolidated Response at 76 n. 57.)

that he saw similar erosion at Old San Carlos and that he was extremely concerned about "exposure of Apache cultural sites and especially burials now undoubtedly occurring." (Plaintiffs' Exhibits, Ex. 7 at 2.) Apparently, the Old San Carlos was underwater at the time of his report. Plaintiffs do not present any evidence that subsequent draining or drawdowns of the Lake validated his suspicions regarding exposure of burial sites at Old San Carlos.

In comparison, Defendants' expert, Dr. Paul Nickens, examined the Old San Carlos cemetery and found that it was capped with concrete grout and was in stable condition, with no exposed human remains or other objects protected by NAGPRA. (Defendants' Exhibits, Ex. 10: Expert Witness Report (Report) at 4, 10–28, 30.)

Nickens considered the Plaintiffs' claim that more than 250 archaeological and burial sites located around the Lake are subject to exposure and damage when the reservoir is drawn down. (Report at 4, ¶ 1.) He found that nearly all of the sites referred to by Plaintiff lie above the maximum pool level of 2,511 feet elevation. *Id.* Only 12 archaeological sites, including Old San Carlos, are in the drawdown zone, and that "[w]ith the exception of the Apache cemetery at Old San Carlos, none of the currently recorded sites in the drawdown zone is a known Apache grave." (Report at 4, ¶¶ 1–2.) Paragraph 3 includes the following:

> Both the Old San Carlos agency/military site and the associated Apache cemetery have been inundated numerous times by San Carlos Lake. Very minor loss of topsoil has occurred over time at the agency site, and no erosion is evident at the cemetery. The cemetery was capped with concrete in 1929 and remains stable and well protected from potential impacts from operation of the reservoir and human intrusions. Impact assessment of the site and cemetery in

December 2001 and March 2002 confirm these conclusions.

(Report at 4–5, ¶ 3.)

Furthermore, Old San Carlos and the Apache cemetery are exposed at 2,429 feet elevation which is the corresponding elevation level for Plaintiffs' proposed conservation pool of 75,000 acre-feet of water. *Id.* at ¶¶ 3, 6. The conservation pool, maintained at this elevation, would subject Old San Carlos and the cemetery to constant and continual wave action from the wind and boat traffic. *Id.* Nickens based his opinions on a field study done in 1993 and on Appendix B to the Final Environmental Assessment done in 1998 in relation to the structural modifications made to Coolidge Dam and research done in relation to BIA's efforts to register sites as historic pursuant to NHPA. (Report at 8.)

Unfortunately, the primary field work in 1993 focused on sites above the drawdown zone and in 2002 when the Expert Report was prepared there was little archaeological field survey and associated recording of prehistoric and historic sites in the actual drawdown zone. *Id.* at 9. In 1992, SCIIP did, however, conduct Phase One of a study to relocate and reassess previously recorded archaeological sites. *Id.* at 10–11. The first step was to relocate sites located in the drawdown zone. As a result of the 1992 study, the 2002 San Carlos Reservoir Site Mitigation and Protection Project Progress Report was prepared. Sixty-two sites were revisited and evaluated, an additional six previously unrecorded sites were assessed, including 5 single historic period Apache burials and one large stone check dam. *Id.* There was no recorded vandalism, some minor biotic disturbance, but no severe physical erosion impacts, including reservoir inundation or drawdown effects. *Id.*

Old San Carlos lies below the high water level and has been inundated numerous times since 1928. In 1993, it was underwa-

ter, but in 2001 it was partially exposed and in 2002, it was fully exposed. Defendants' Expert conducted an impact assessment of the site and found that the Old San Carlos Agency site had incurred considerable soil loss along the western slope of the terrace site, but no historic features are in this area. *Id.* at 14–27. The agency site on the top of the terrace had only seen the loss of a few inches of topsoil at its western edge with little impact to the concrete foundations of the old agency buildings. *Id.*

According to old agency records, there were three cemeteries at Old San Carlos. One was relocated to a cemetery near the mission in Peridot during construction of the dam and one was capped with concrete prior to inundation of the Reservoir. *Id.* Records of the third are obscure with uncertainty even of its actual existence. *Id.* Defendants' expert's opinion that the capped cemetery was in stable condition was based on a site check during the 2001 and 2002 drawdowns of the Reservoir that left the cemetery exposed. *Id.*

The Federal Defendants recognize that there is an active and ongoing archaeological site vandalism problem at San Carlos Lake. *Id.* at 28. The problem exists across the board above and below the drawdown zone, but it is more prevalent in the backshore zone where sites can be approached throughout the year. *Id.*[21] Over the past year or so, the Federal Defendants have undertaken a number of interrelated efforts to ensure that all cultural resources are identified, evaluated and protected. *Id.* at 29–30.[22]

Plaintiffs do not dispute the Defendants' expert report. For evidentiary support of the NAGPRA claim, they refer the Court to references of their own self-serving expressions of concern that the process of draining the Lake and low water levels will result in uncovering human remains and/or other objects. Only when and if this occurs and is reported to the BIA will NAGPRA duties and obligations be triggered. Plaintiffs have not presented evidence of a scenario like that in *Yankton* where NAGPRA was triggered by an inadvertent discovery of a specific location, a cemetery, where human remains or protected objects were located and subject to being uncovered, damaged, and/or destroyed by drawdowns or draining of the Lake.

In the face of the Defendants' evidentiary challenge, Plaintiffs cannot rely upon mere conclusory allegations nor rest on the pleadings. *See Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (explaining that once a moving party has carried its burden of producing evidence that tends to show there is no genuine issue of material fact, the opposing party must then direct the Court's attention to specific evidence in the record sufficient to establish the existence of a genuine issue of material fact for trial). Here, at the most the Plaintiffs

---

**21.** Ease of access and numbers of visitors at the Lake combined with number of rangers and patrol intervals combine to provide for worsening of the situation. *Id.* Other contributing factors are: construction of new access roads and campgrounds around the perimeter of the Lake, maintenance of existing access roads, and encouraging large numbers of visitors, combined with no increase in security. *Id.* Boats allow further ease of access to sites.

**22.** The Federal Defendants have finalized an Interim Archaeological Protection Action Plan to be implemented immediately. *Id.* In 1999 and 2000, the BIA initiated formal consultation with the Tribe regarding all cultural resources. *Id.* A draft report, the San Carlos Apache Comprehensive Historic Property Plan and Outline for Cultural Resource Management Plan was prepared and forwarded to the Tribe on March 22, 2002. *Id.* In 2002, the BIA was examining proposals for an archaeological survey in the drawdown zone. *Id.* The BIA initiated a Geomophology and Erosion Study to conduct field studies to acquire relevant data to better assess future mechanisms of erosion at the Reservoir and design a better future protection plan. *Id.*

have produced a mere scintilla of contrary evidence. *See Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000) (noting that a scintilla of evidence or evidence that is not significantly probative does not present a genuine issue of material fact). Plaintiffs fail to dispute Defendants' showing that there has been no inadvertent discovery of human remains or protected objects to trigger NAGPRA obligations and procedures.

### Breach of Trust Responsibilities to Apache Tribe

Plaintiffs' breach of trust claim is based on the following assertions: 1) Federal Defendants are creating a public nuisance by drawing the Lake down below 75,000 acre-feet of water and by draining it at the end of the calender year; [23] 2) Defendants continue to drain the Lake in spite of the irreparable harm the practice has on the historic and cultural properties located beneath the waters of the Lake, and 3) Defendants refuse to abide by their statutory obligations under NAGPRA and ARPA. (Plaintiffs' Consolidated Response at 79.)

 The Government cannot be found in breach of its general fiduciary obligations to a Tribe where Congress has decreed that it assume dual responsibilities with potentially conflicting interests. *Nevada v. United States,* 463 U.S. 110, 128, 141, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983). In *Nevada,* the Court considered whether the government is held to the same fastidious standards of a private fiduciary in a reclamation case where Congress had obligated the government to "carry water on at least two shoulders" when it delegated responsibility to the Secretary of Interior to supervise Indian tribes and to commence reclamation projects in and adjacent to Indian lands. *Id.* at 128, 103 S.Ct. 2906. The Court held that because Congress had chosen to create this dynamic, "it is simply unrealistic to suggest that the Government may not perform its obligation to represent Indian tribes in litigation when Congress has obligated it to represent other interests as well." *Id.*

 Under *Nevada,* SCIIPs operation in compliance with the San Carlos Project Act of 1924 Act and the Globe Equity Decree of 1935 cannot be a breach of the Government's general trust responsibilities to the Plaintiffs. Consequently, Plaintiffs assertion that the Federal Defendants are creating a public nuisance in breach of their general trust responsibilities to the San Carlos Apache Tribe fails.

 Furthermore, this breach of trust claim challenging the day-to-day operation of SCIIP, including the drawdowns and draining of the Lake, should have been brought before the Indian Claims Commission, pursuant to the Indian Claims Commission Act. *See* 25 U.S.C. § 70k. The SCIIP operation challenged here, specifically the drawing down and draining of the Lake, originated from the 1924 San Carlos Project Act and 1935 Consent Decree.[24] Prior to 1946, Indian tribes

---

**23.** See n. 20.

**24.** In relation to their NEPA claim, Plaintiffs suggest that SCIIP operations have changed to now include draining the Lake at the end of the calender year. "if an ongoing project undergoes changes which themselves amount to 'major federal action,' the operating agency must prepare an EIS." *Upper Snake River Chapter of Trout Unlimited v. Hodel,* 921 F.2d 232, 234 (9th Cir.1990). Such a change might arguably be relevant to determine the running or tolling of the statute of limitations in relation to Plaintiffs' breach of trust claims. Accordingly, the Court notes that Plaintiffs offer no evidentiary support for their assertion that since 1990 when SCIIP spilled the water from the Lake so work could be performed in relation to the Safety of Dams Act and allegedly discovered that this recharged its wells downstream, SCIIP has adopted the practice of draining the Lake every year by December 31. Plaintiffs present no evidence

could not litigate claims against the United States unless they obtained specific permission from Congress. *Navajo Tribe v. New Mexico,* 809 F.2d 1455, 1460 (10th Cir.1987). But in 1946, Congress passed the Indian Claims Commission Act (ICCA) creating a quasi-judicial body to hear and determine all tribal claims against the United States accruing before August 13, 1946. *Id.*[25] Any claim accruing before 1946 had to be brought within 5 years of the enactment of the ICCA. *Id.*

"Any[26] claim that accrued before August 13, 1946, and which was not filed with the Commission by August 13, 1951, could not 'thereafter be submitted to any court or administrative agency for consideration,' nor could such a claim 'thereafter be entertained by the Congress.'" *Id.* at 1460 (*citing* 25 U.S.C. § 70k (1976)). Consequently, there is no jurisdiction for this Court to consider the breach of trust challenge to the propriety of SCIIP's operations and management in compliance with the San Carlos Act of 1924 and Globe Equity Decree of 1935.

■ The United States discharges its general fiduciary obligations to an Indian Tribe by complying with generally applicable regulations and statutes. *Okanogan Highlands Alliance v. Williams,* 236 F.3d 468, 479 (9th Cir.2000) (*citing Morongo Band,* 161 F.3d at 574). Plaintiffs claim that this fiduciary duty has been breached by the Federal Defendants' draining of the Lake because it causes irreparable harm to protected historic and cultural properties protected by federal law and by Defendants' refusal to comply with NAGPRA and ARPA.

■ The Federal Defendants assert that these claims are barred by the six-year statute of limitations set forth at 28 U.S.C. § 2401(a) that provides, in part: "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Section

---

to support these assertions of its legal counsel. Unsupported assertions by legal counsel are insufficient to create an issue of fact for trial. *Stanley v. University of Southern California,* 178 F.3d 1069, 1076 (9th Cir.1999).

25. If a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could adjudicate the claim and award relief for damages or injuries suffered after 1946 from the continuing course of conduct. *See Navajo Tribe v. United States and Nez Perce Tribe,* 218 Ct.Cl. 11, 586 F.2d 192, 198, 199–200 (1978). The "continuing wrong" doctrine is distinguishable from the "continuing claim" doctrine applied to toll the running of statute of limitations, 28 U.S.C. § 2401. *See also, Cherokee Nation of Oklahoma v. United States,* 21 Cl.Ct. 565, 572 (Cl.Ct.1990) ("Plaintiff's terminology is inaccurate: the 'continuing wrong' doctrine is applicable only to cases before the ICC." Continuing claim exception is narrower in scope than the ICC continuing wrong doctrine.)

26. *See Navajo Tribe v. New Mexico,* 809 F.2d at 1465 (rejecting Tribe's assertion that the ICCA applied only to taking of land as being far too restrictive given Congressional expression that Commission's jurisdiction should be broad enough so that no tribe could come back to Congress later and say that it had a meritorious claim which Commission was not authorized to hear it); *see also* 25 U.S.C. § 70a (1976) (Commission's jurisdiction broad enough to include all possible claims: 1)claims in law or equity arising under the Constitution, · laws, treaties of the United States, ... 2) all other claims in law or equity, including those sounding in tort, ... 3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether in law or fact or any other ground cognizable in equity; 4) claims arising from the taking by the United States, whether as a result of a treaty or otherwise; 5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.)

2401(a) applies to equitable claims as well as claims for monetary damages. *Sisseton–Wahpeton Sioux Tribe of Lake Traverse Indian Reservation v. United States,* 895 F.2d 588, 592 (9th Cir.1990). Section 2401(a) is the statute of limitations that applies to claims brought pursuant to the APA. *Wind River Mining Corporation v. United States,* 946 F.2d 710, 712–13 (9th Cir.1991).

"The doctrine of sovereign immunity precludes suit against the United States without consent of Congress; ... The applicable statute of limitations is a term of consent." *Sisseton–Wahpeton Sioux Tribe,* 895 F.2d at 592. "Because 28 U.S.C. § 2401 is a condition of the waiver of sovereign immunity, courts are reluctant to interpret the statute of limitations in a manner that extends the waiver beyond that which Congress clearly intended." *Id.* (*citations omitted* ).

■ Indian Tribes are not exempt from statutes of limitations governing actions against the United States. *Id.* "The plaintiff's failure to sue within the period of limitations is not simply a waivable defense; it deprives the court of jurisdiction to entertain the action." *Id.* (*citations omitted* ), *but see Cedars–Sinai Medical Ctr. v. Shalala,* 125 F.3d 765, 770 (9th Cir.1997) (holding that § 28 U.S.C. § 2401(a) is not jurisdictional and can be waived).

■ For purposes of section 2401(a), the statute of limitations does not commence running until plaintiffs knew or should have known the facts upon which their claims are based. *Id.* at 594. The drawdowns and draining of the Lake were provided for in the San Carlos Project Act of 1924 and the Globe Equity Decree of 1935 and have been a part of the routine operation of the dam since the establishment of SCIIP.[27] The federal statutes relied on by Plaintiffs for these breach of trust claims were all passed well in advance of 6 years before Plaintiffs filed this case. Consequently, Plaintiffs had sufficient facts to know of these violations long before they brought suit here. Unless there is some exception to the 6–year limitation period, Plaintiffs claims are barred by 28 U.S.C. § 2401.

■ Plaintiffs assert that under the " 'continuing claims' doctrine the breach of trust claims cannot be barred by the statute of limitations." (Plaintiffs' Consolidated Response at 84.) " 'The continuing claim doctrine prevent[s] a statute of limitations from shielding an offender in an on-going wrongdoing, and protect[s] recurring claims that might otherwise be barred if based upon events occurring more than six years prior to suit.' " *Nicholas v. United States,* 42 Fed.Cl. 373, (Fed.Cl. 1998) (*citing Hatter v. United States,* 38 Fed. Cl. 166, 180 (1997)). The continuing claims doctrine applies when the government owes a continuing duty to the plaintiffs. *Boling v. United States,* 220 F.3d 1365, 1373–74 (Fed.Cir.2000). Each time the government breaches the duty, a new cause of action arises. *Id; see e.g.; Cherokee Nation of Oklahoma v. United States,* 26 Cl.Ct. 798, 803 n. 4 (Cl.Ct.1992) (treating each alleged trespass as its own individual wrong); *Mitchell v. United States,* 13 Cl.Ct. 474 (Cl.Ct.1987) (continuing claim doctrine applied because 25 U.S.C. § 466 created ongoing governmental duty to regenerate the forest so every year that passed without replanting gave rise to a new cause of action; doctrine did not apply to allegation that the government failed to secure fair compensation for right-of-way because duty to collect compensation arose only once when right-of-way was granted).

---

**27.** See n. 23.

"The doctrine does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach." *Boling*, 220 F.3d at 1373. For example, the continuing claims doctrine could not be invoked to extend the statute of limitations beyond 6 years every time wild horses drank from stock ponds on plaintiff's property as required under the Wild Free-Roaming Horses and Burros Act. *Id. (citing Fallini v. United States*, 56 F.3d 1378, 1382 (Fed. Cir.1995)). In *Fallini*, the court held that the plaintiff's claim accrued when the statute was enacted because this was the sole governmental action that arguably breached a duty owed to the plaintiffs. *Id.* at 1383.

In *Sisseton–Wahpeton*, the Sisseton–Wahpeton Tribes challenged a Distribution Act pursuant to which funds to satisfy a compromise judgment entered by the Indian Claims Commission were to be distributed to individual lineal descendants not members of the tribe, instead of to the tribes. *Sisseton–Wahpeton*, 895 F.2d at 591–92. The court held that the passage of the Distribution Act, not the Tribes demand for payment, triggered the running of the statute of limitations because as of the passage of the Act, the Tribes had immediate knowledge of the precise share of money Congress found them entitled to as well as Congress' intent to distribute the balance to others. *Id.* at 592–93. The Court noted that in fact, the Tribes participated in the creation of the distribution plan, and eventually endorsed the Act. *Id.*

██ Here, Plaintiffs were similarly situated to the *Sisseton–Wahpeton* Tribe. Plaintiffs knew in 1924 when Congress passed the San Carlos Project Act that the Reservoir and its waters were being constructed for the use of GRIC and SCIDD, to the exclusion of the Apache Tribe. Any

questions that remained regarding the Apache Tribe's entitlement to the water in the Lake were resolved in 1935 by the Globe Equity Decree. Even assuming that the statute of limitations was tolled until the passage of the federal statutes that Plaintiffs allege SCIIP operations violate, Plaintiffs fail to establish any specific duty under these statutes that Defendants have violated within the 6-year limitation period. Only then would the continuing claims doctrine apply to toll the running of the limitations period. Plaintiffs' breach of trust claims are barred under 28 U.S.C. § 2401(a).

Accordingly,

**IT IS ORDERED** that the Federal Defendants' Motion for Summary Judgment (document 202) is **GRANTED.**

IT IS FURTHER ORDERED that the motions for summary judgment filed by GRIC and SCIDD (documents 196 and 213) are denied as moot.

**IT IS FURTHER ORDERED** that judgment shall be entered accordingly.